NATHAN BRAITMAN AND OLGA BRAITMAN, PLAINTIFFS-RESPONDENTS, v. OVERLOOK TERRACE CORP., DEFENDANT-APPELLANT.

Argued April 28, 1975—Decided October 9, 1975.

*Mr. James E. Flynn* argued the cause for appellant (*Mr. James P. Dugan,* attorney).

*Mr. Sydney I. Turtz* argued the cause for respondents.

The opinion of the Court was delivered by

PASHMAN, J. The principal question posed by this appeal is whether a landlord may incur civil liability to a residential tenant for loss occasioned by theft on the basis of the landlord's failure to supply adequate locks on the door to plaintiffs' premises. The trial court, sitting without a jury, entered judgment for plaintiffs and the Appellate Division affirmed, *Braitman v. Overlook Terrace Corp., 132 N. J. Super.* 51 (App. Div. 1974). We granted defendant's petition for certification to consider the proper scope of a residential landlord's duty with respect to providing adequate security devices for the protection of his tenants' premises. 67 *N. J.* 96 (1975). We affirm.

I

Plaintiffs Nathan and Olga Braitman entered into a lease with defendant on January 30, 1971 for occupancy of an apartment in Overlook Terrace, a 600-unit, middle income

high-rise complex located at 5701 Boulevard East, West New York, New Jersey. Although the lease term commenced on March 1, plaintiffs did not take possession of the premises until March 16, 1971.[1] On the very day they moved in, Braitman noticed that the dead lock on the door of his apartment was not working properly.[2]

Several hours after discovering the defect in the lock, Braitman notified the management office where he was told that the situation would be "taken care of." Thereafter, when no action was taken by defendant to repair the lock, plaintiff repeated his complaint to the management office on two other occasions. In addition, he complained to the apartment superintendent on at least two occasions.[3] On several

[1] Plaintiffs were the first occupants of their apartment, and construction was still going on at the complex when they moved in.

[2] The door to plaintiffs' apartment was equipped with two locks. The first lock (called a "slip lock"), was controlled by means of two buttons located in the side of the door. With one button pushed in, a key was not needed to open the door. With the other button depressed, however, the door could only be opened from the outside by means of a key inserted into a lock beneath the doorknob. The second lock (variously referred to as bolt lock, dead bolt or dead lock) was operated from the inside by means of a small knob on the inside of the door which causes a metal bolt to slide horizontally into a flange located in the door frame. From the outside, the dead lock was operated from the same keyhole (with a full turn of the key) which controls the first lock. It was the dead lock which plaintiffs found inoperable when they moved into their apartment. According to plaintiffs' testimony, the bolt would not close from the outside or the inside of the door despite use of "manual force."

[3] Braitman also asked a local locksmith to install a security lock on his door "right after he moved in." The locksmith declined to comply without written permission from the owner of the building. The locksmith then spoke to a security guard about installing a lock for plaintiffs. According to the locksmith, however, the guard informed him that "you're not allowed to install locks." Although both the company manager and co-manager of defendant corporation testified that they had never refused a request by plaintiffs to install an additional security device, the co-manager stated that defendant's policy with respect to the installation of extra hardware on the doors was "frowned upon and not acceptable." Defendant also conceded this policy at oral argument.

occasions, Mrs. Braitman also complained to the management about the inoperable lock.

On March 24, 1971, more than one week after Braitman initially notified defendant of the broken dead lock, an unknown thief entered his apartment, ransacked it and absconded with personal property, mostly jewelry, valued at $6,100. The lock was repaired two days after the robbery.

The crime was investigated by officers of the West New York Police Department who found no signs of forced entry. When asked if he performed any tests on the door, one of the officers testified as follows:

A. I slipped the lock. I went out in the hall. I asked Mr. Braitman to close the door and I checked to see if it was locked and then I slipped it.

Q. How did you slip it?

A. With a piece of celluloid.

Q. What did you do, tell the Court specifically what you did.

A. I just slid the piece of celluloid in between the jamb and the lock and pushed the door.

Q. And did the door open?

A. Yes. I shocked Mr. Braitman.

Q. Now, did you try on that occasion to manipulate the bolt?

A. I asked Mr. Braitman why the door wasn't double locked prior to that, and he said he had notified the management that he is having trouble with the lock.

Q. Did you try the bolt?

A. Yes, it did not operate.

The witness added that if one attempted to enter the apartment without a key, the dead lock would have to be "picked" to gain access to the apartment, a task which would re-

In addition, one of the rules contained in the lease between plaintiffs and defendant provides as follows:

Landlord may retain a pass key to the demised premises. Tenant shall not alter any lock or install a new lock or a knocker on any door of the demised premises without the written consent of the landlord. In case such consent is given, tenant shall provide the landlord with an additional key for the use of the landlord pursuant to the landlord's right of access to the demised premises.

quire tools possessed by someone "very well experienced at break-ins." Another police officer, who served as records clerk for the West New York Police Department, also testified that several other buildings in the area which employed security systems comparable to those used by defendant had experienced a number of break-ins prior to the date when plaintiffs' apartment was entered.

In May 1971 plaintiffs instituted the present suit to recover for their losses which resulted from the theft. Judge Bilder, as the trier of fact, found that the dead lock was inoperative, the remaining slip lock did not afford reasonable security, defendant had adequate knowledge of the defect and sufficient time to remedy it, the slip lock was secured on the day of the theft, the thief gained access to plaintiffs' apartment by "slipping" the lock, and that the robbery was a foreseeable consequence of the condition. Based upon these findings the court concluded that defendant was negligent and that its conduct proximately caused plaintiffs' loss. Rejecting the suggestion that the Braitmans had been contributorily negligent, the court concluded that plaintiffs were entitled to $6,100 in damages.

On appeal, the Appellate Division observed that the "mere relationship" of a landlord and tenant does not generally impose upon the former a duty to protect his tenant from crime. *Braitman v. Overlook Terrace Corp., supra,* 132 *N. J. Super.* at 55. Apart from the landlord-tenant relationship, however, the court reasoned that recovery against a landlord for theft may be predicated upon proof of negligence proximately causing the tenant's loss. Framing the issue in terms of foreseeability, Judge Handler, speaking for the Appellate Division, concluded that the evidence sufficiently supported the findings of the trial court that defendant's conduct unreasonably enhanced the risk of a break-in:

The findings of the court, based upon the evidence, indicate that the apartment door was inadequately secured through defendant's neglect, that this unreasonably enhanced the risk or hazard of a break-in and robbery and that such an occurrence was reasonably

foreseeable. The evidence was also sufficient to support the findings that defendant had ample notice that the door was not adequately secured and sufficient opportunity to correct this condition. [132 *N. J. Super.* at 56]

Based upon its conclusion that the ultimate finding of the trial court, *i. e.,* that defendant's neglect was the proximate cause of plaintiffs' loss, was amply supported, the Appellate Division affirmed the judgment below.[4]

Although the Appellate Division correctly observed that the relationship between a landlord and his tenant does not, without more, impose upon the landlord a duty to protect the tenant from the crime of third persons, *see McCappin v. Park Capitol Corp.,* 42 *N. J. Super.* 169, 172 (App. Div. 1956); *see generally* Annotation, "Landlord's obligation to protect tenant against criminal activities of third persons," 43 *A. L. R.* 3d 331, 335 (1972), it is equally apparent, however, that there has been a recent judicial trend toward expanding the scope of duty on the part of landlords with respect to tenant security. 2 *Powell, The Law of Real Property* (Rohan ed. 1974), ¶ 234[2][g] at 350.

The leading case in this area is *Kline v. 1500 Massachusetts Ave. Apartment Corp.,* 141 *U. S. App. D.C.* 370, 439 *F.* 2d 477 (D. C. Cir. 1970). Plaintiff in *Kline,* a tenant in defendant's apartment building, sustained serious injuries when she was assaulted and robbed by an intruder in the common hallway of her apartment house. Security measures in the building had been curtailed since plaintiff had first moved in despite an increasing level of criminal activity in the hall-

---

[4]The Appellate Division rejected the additional finding of the trial court that defendant refused to allow plaintiffs to install their own lock by a locksmith. *Braitman, supra,* 132 *N. J. Super.* at 55. The court added, however, that its rejection of this finding was not dispositive of the appeal. Our own approach to the case also makes it unnecessary for us to consider the propriety of the latter finding. See n. 3, *supra.*

ways of the building. 439 *F*. 2d at 479.[5] The district court held that as a matter of law the landlord had no duty to protect tenants from foreseeable criminal acts committed by third parties, but on appeal the Court of Appeals found a "clear" breach of duty and reversed and remanded for limited consideration of plaintiff's damages. 439 *F*. 2d at 486–87. In deciding *Kline,* the court recognized that in general a private person had no duty to protect others from crime, but in the court's view this general principle was inappropriate in contemporary urban apartment living:

> But the rationale of this very broad general rule falters when it is applied to the conditions of modern day urban apartment living, particularly in the circumstances of this case. The rationale of the general rule exonerating a third party from any duty to protect another from a criminal attack has no applicability to the landlord-tenant relationship in multiple dwelling houses. The landlord is no insurer of his tenants' safety, but he certainly is no bystander. And where, as here, the landlord has notice of repeated criminal assaults and robberies, has notice that these crimes occurred in the portion of the premises exclusively within his control, has every reason to expect like crimes to happen again, and has the exclusive power to take preventive action, it does not seem unfair to place upon the landlord a duty to take those steps which are within his power to minimize the predictable risk to his tenants. [439 *F*. 2d at 481]

Accordingly, the court concluded that the duty of safeguarding "the entire premises and the areas peculiarly under the landlord's control" should be imposed upon the landlord, since he is the party to the lease "who has the effective capacity to perform these necessary acts." 439 *F*. 2d at 482.[6]

---

[5]The attack upon plaintiff occurred only two months after a similar assault upon another female tenant had taken place in the same common area. 439 *F*. 2d at 480.

[6]The court in *Kline* extracted this duty from three sources: (1) the logic of the situation; (2) an implied obligation in the contract between the landlord and tenant for the landlord to provide protective measures; and (3) an analogy between the relationships of the modern urban apartment dweller and his landlord and that

The Supreme Court of Michigan has also concluded that a landlord does not necessarily escape liability to his tenant merely because the tenant's injuries were the result of criminal acts by third persons. In *Johnston v. Harris,* 387 *Mich.* 569, 198 *N. W.* 2d 409 (1972), plaintiff, an elderly tenant in an inner city apartment, was struck and robbed by an unknown youth who was lurking in a poorly lighted, unlocked vestibule of the building. The attack occurred in the early evening hours when plaintiff was returning home to his apartment. 198 *N. W.* 2d at 409. Despite plaintiff's introduction of evidence which showed inadequate lighting in the porch area, that the outer door to the vestibule was continuously unlocked and that the building was in a high crime area, the trial court, sitting without a jury, directed a verdict for defendant, stating that there was no fault on the part of the landlord which contributed to or caused plaintiff's injuries. The Court of Appeals affirmed on the ground that although plaintiff presented a prima facie case on the landlord's duty and breach, there was inadequate proof of proximate causation. 198 *N. W.* 2d at 410.

The Supreme Court, however, concluded that it was improper to view plaintiff's pleadings and proofs so narrowly thereby ignoring the "interwoven assertion" that the landlord had negligently created a condition conducive to criminal assaults:

> The crux of plaintiff's case was that in a high crime district it is reasonably foreseeable that inadequate lighting and unlocked doors would create conditions to which criminals would be attracted to carry out their nefarious deeds. [198 *N. W.* 2d at 410]

---

of an innkeeper and his guest. 439 *F.* 2d at 483–85. With respect to the first source of the landlord's duty, the court said:

> If we were answering without the benefit of any prior precedent the issue as posed by the appellee landlord here, "whether a duty should be placed on a landlord to take steps to protect tenants from foreseeable criminal acts committed by third parties," we should have no hesitancy in answering it affirmatively, at least on the basis of the facts of this case. [439 *F.* 2d at 483–84]

Relying on various sections of the *Restatement, Torts* 2d dealing with criminal conduct[7] and causation, as well as prior case law which had found various criminal acts foreseeable in other factual contexts, the court concluded that "actionable negligence may lie in these circumstances" and that the trial court's failure to consider plaintiff's proofs in the proper procedural context precluded an entry of judgment against him on the state of the record when defendant's motion for a directed verdict was granted. Consequently, the court reversed and remanded for a new trial. 198 *N. W.* 2d at 411. *See also Samson v. Saginaw Professional Bldg., Inc.,* 393 *Mich.* 393, 224 *N. W.* 2d 843 (1975).

A Georgia appellate court has taken a similar turn. In *Warner v. Arnold,* 133 *Ga. App.* 174, 210 *S. E.* 2d 350 (Ct. App. 1974), plaintiffs' apartment was entered by an intruder who set a fire which caused damage to plaintiffs' personal property. Plaintiff testified that as a result of numerous forcible entries in other apartments as well as her observation of other tenants opening doors with knives or other sharp instruments, she asked the building manager for an additional lock. Although the lock was promised, it was

---

[7]Two of the sections of the *Restatement, Torts* 2d (1965) relied upon by the court provide as follows:

§ 302 B.  Risk of Intentional or Criminal Conduct

An act or an omission may be negligent if the actor realizes or should realize that it involves an unreasonable risk of harm to another through the conduct of the other or a third person which is intended to cause harm, even though such conduct is criminal.

§ 448.  Intentionally Tortious or Criminal Acts Done Under Opportunity Afforded by Actor's Negligence

The act of a third person in committing an intentional tort of crime is a superseding cause of harm to another resulting therefrom, although the actor's negligent conduct created a situation which afforded an opportunity to the third person to commit such a tort or crime, unless the actor at the time of his negligent conduct realized or should have realized the likelihood that such a situation might be created, and that a third person might avail himself of the opportunity to commit such a tort or crime.

never installed despite several inquiries. 210 *S. E.* 2d at 351.

On appeal from the denial of defendant-landlord's motion for summary judgment, the court affirmed. Analyzing the case in terms of foreseeability and duty to repair, the court concluded that:

"The landlord is no insurer of his tenant's safety, but he is certainly no bystander." Kline v. 1500 Massachusetts Ave. Apt. Corp., 141 U. S. App. D. C. 370, 439 F. 2d 477, 43 A. L. R. 3d 311. This premise and the authority previously cited, is coupled with the undeniable fact that the purpose for having secure locks on the door to the plaintiffs' apartment, was to prevent unauthorized entry thereto and the accompanying wrongful criminal acts. The immediacy of the connection between the inadequate (although functioning) lock, the landlord's notice of the inadequacy, either actual or constructive, and the burglary and arson, compels us to hold that the landlord is not insulated as a matter of law, and that the jury should properly pass on the questions of agency, notice, foreseeability, intervening causation, assumption of risk, as well as the suitability of the lock in question. [210 *S. E.* 2d at 353–54]

To a similar effect is *Ramsay v. Morrissette,* 252 *A.* 2d 509, 512 (D. C. Ct. App. 1969) (tenant who was the victim of an assault permitted to proceed to trial to establish negligence from, among other things, the landlord's failure to install a lock on the front door). See also *Smith v. General Apartment Co.,* 133 *Ga. App.* 927, 213 *S. E.* 2d 74 (Ct. App. 1975); *Sherman v. Concourse Realty Co.,* 47 *A. D.* 2d 134, 365 *N. Y. S.* 2d 239 (App. Div. 1975).

With the foregoing decisions as evidence of a developing judicial reluctance to allow landlords to insulate themselves from liability to their tenants for the criminal conduct of third parties, we proceed to an examination of the pertinent case law in our own State. In *McCappin v. Park Capitol Corp., supra,* 42 *N. J. Super.* at 172, the court recognized that:

Recovery against a landlord for loss sustained because of theft must be predicated either upon the breach of a contractual obligation or upon a showing of negligence constituting the proximate cause of the loss.

*McCappin* involved a claim for $200 allegedly stolen from plaintiff's apartment by reason of the negligence of the apartment superintendent. Plaintiff placed the money in a bureau in her apartment, but discovered that it was missing several days later. After discovering her loss, plaintiff also noticed that several keys, including hers, were missing from a keyboard which had been moved from the superintendent's apartment to a portion of the basement which was off an open corridor. 42 *N. J. Super.* at 171. Plaintiff's theory was that by placing the keys in an accessible area the superintendent invited unauthorized entry and consequently her loss was foreseeable even if by intervening criminal conduct. Although the court reversed plaintiff's judgment, it did so, without discounting her theory, on the basis that there was insufficient proof of proximate causation since the record was "devoid of any proof as to when or by whom plaintiff's key was removed." 42 *N. J. Super* at 173. *See also Panglorne v. Weiss,* 86 *N. J. L.* 286 (E. & A. 1914).

In the present case, the trial court found that defendant's failure to repair the bolt lock was negligent and that the resulting robbery was foreseeable. The Appellate Division sustained this finding as well as the court's ultimate conclusion that the theft was proximately caused by defendant's negligent conduct. *Braitman, supra,* 132 *N. J. Super.* at 56–57. Defendant, however, seeks to avoid the impact of this conclusion by relying upon our decision in *Goldberg v. Housing Authority of Newark,* 38 *N. J.* 578 (1962).

Plaintiff in *Goldberg* was beaten and robbed by two men while he was delivering milk to defendant's housing project. Defendant was a public corporation created by the City of Newark pursuant to the Local Housing Authorities Law. The jury found for plaintiff and the Appellate Division affirmed. Although the complaint alleged negligence in general terms, plaintiff's sole thesis was that defendant had a duty to provide police protection. 38 *N. J.* at 580 n. 1. With the issue thus narrowed, we concluded that aside from questions of foreseeability, "the duty to provide police protection is and

should remain the duty of government and not the owner of a housing project." 38 *N. J.* at 592. Resolution of this issue, however, is not dispositive of the question of a landlord's liability in the present factual context, a proposition which we specifically noted in deciding *Goldberg*:

> There are cases dealing with the liability of a landlord for theft of property of his tenants. Liability may exist if there is a failure to secure such property placed within the control of the landlord. And the landlord may be liable for theft if he carelessly enables a thief to gain entrance to the apartment of the tenant. [38 *N. J.* at 588 (citing *McCappin, supra*)]

Having concluded that *Goldberg, supra,* is not controlling on the issue of defendant's liability on the facts presented by the present appeal, we proceed to a consideration of defendant's contention that plaintiffs' loss was not proximately caused by the conduct of defendant but was rather the consequence of an unforeseeable act of a third party over whom defendant had no control. In our view, however, defendant's contention must be rejected. In *Genovay v. Fox,* 50 *N. J. Super.* 538 (App. Div. 1958), rev'd on other grounds, 29 *N. J.* 436 (1959), a case involving injuries to the customer of a bowling alley-bar sustained when he was shot by a gunman, the court said:

> The fact that the risk of harm to the plaintiff was attributable to voluntary activity of others not under the control of the defendant does not of itself preclude liability if the harm by human intervention was foreseeable and a reasonable man so situated would take precautions to prevent it. * * * The criminality of the activity is but one circumstance in the foreseeability of harm. [50 *N. J. Super.* at 550–51]

To a similar effect is *Rappaport v. Nichols,* 31 *N. J.* 188, 201 (1959), where we said that "negligence may consist in the creation of a situation which involves unreasonable risk because of the expectable action of another." See also *Lillie v. Thompson,* 332 *U. S.* 459, 68 S. Ct. 140, 92 L. Ed. 73 (1947); *Brower v. N. Y. C. & H. R. R. Co.,* 91 *N. J. L.*

190 (E. & A. 1918); Annotation, "Private person's duty and liability for failure to protect another against criminal attack by third person," 10 *A. L. R.* 3d 619, 643–48 (1966).[8]

In the present case, the trial court found as a fact that the thief gained access to plaintiffs' apartment by slipping the lock. The Appellate Division concluded that there was sufficient evidence before the trial court to support that finding and reasoned that the key question was whether it was foreseeable that a theft might result from defendant's failure to fix the defective lock. We agree with that approach.

We also agree with the court's analysis in *Zinck v. Whelan*, 120 *N. J. Super.* 432 (App. Div. 1972) as to the foreseeable consequences of negligence in relation to the intervention of the activity of a thief. In *Zinck*, a case which

---

[8]In 2 *Harper and James, The Law of Torts* (1956), § 20.5 at 1144–45 the authors observe:

So far as scope of duty (or, as some courts put it, the relation of proximate cause) is concerned, it should make no difference whether the intervening actor is negligent or intentional or criminal. Even criminal conduct by others is often reasonably to be anticipated. After all, if I leave a borrowed car on the streets of New York or Chicago with doors unlocked and key in ignition, I am negligent (at least toward the owner) because of the very likelihood of theft. And if I lend a car to one known by me to be habitually careless I am negligent precisely because of the likelihood of his negligent operation of my car. [Footnotes omitted]

See also *Restatement, Torts* 2d, §§ 302B at 88, 448 at 480 (1965) (set forth *supra* at n. 7). Comment *c* to the latter section provides in part:

c. *When actor's negligence consists in creating risk of criminal action by third person.* The actor's conduct may be negligent solely because he should have recognized that it would expose the person, land, or chattels, of another to an unreasonable risk of criminal aggression. If so, it necessarily follows that the fact that the harm is done by such criminal aggression cannot relieve the actor from liability (see § 449). However, it is not necessary that the conduct should be negligent solely because of its tendency to afford an opportunity for a third person to commit the crime. It is enough that the actor should have realized the likelihood that his conduct would create a temptation which would be likely to lead to its commission.

presented the problem of liability for injuries inflicted by a stolen, unlocked automobile parked on a street with the key left in the ignition, Judge Conford exhaustively reviewed the authorities from other jurisdictions and concluded:

> A study of the authorities cited above makes it evident that basically the key to duty, negligence and proximate cause in the fact-pattern under review is the foreseeability *vel non* to a reasonable man of an unreasonably *enhanced hazard*, when a motor vehicle is left unlocked in a public place with key in the ignition, of both the theft or misappropriation of the vehicle and an ensuing mishandling of it by the taker with death, injury or destruction of property of others lawfully using the highways as the result. If there is such foreseeability, then, on principle, particularly in the light of the minimal social utility of the causative conduct of the possessor of the car, a duty arises toward the members of the public using the highways, its breach is negligence, and the injury is the proximate result of the breach or so a jury should be permitted to find in the generality of the cases. [120 *N. J. Super.* at 445; emphasis by the court][9]

See also *Rappaport v. Nichols, supra.* It is also apparent that in light of the prior break-ins in the vicinity of defendant's building, a reasonable man would have recognized the possibility of the enhanced risk that a defective lock would create. Accordingly, it was entirely proper for the Appellate Division to conclude that the loss to plaintiffs was a foreseeable consequence of defendant's neglect. It follows that defendant cannot exculpate itself on the theory that the theft was not proximately caused by its conduct.

▮ In light of the foregoing, it is clear that whether we base our conclusion on the decisions of other states which have identified a duty on the part of landlords to take reasonable measures to safeguard tenants from foreseeable criminal conduct, *e. g., Kline, supra,* or upon a logical extension of the principles of our own case law dealing with the relation-

---

[9]We herewith expressly leave open the question of the reasonable foreseeability in such circumstances as presented in *Zinck* of the stolen vehicle being involved in an accident while being driven by the thief.

ship between the foreseeability and criminal conduct, *e. g.* *Zinck, supra,* the result is the same. A residential tenant can recover damages from his landlord upon proper proof that the latter unreasonably enhanced the risk of loss due to theft by failing to supply adequate locks to safeguard the tenant's premises after suitable notice of the defect.

■ Although not initially briefed or argued by the parties (counsel's written comments were thereafter invited by the Court), we note an additional source of the landlord's duty with respect to security measures. The New Jersey Hotel and Multiple Dwelling Law, *N. J. S. A.* 55:13A–1 *et seq.,* which is the successor to the former Tenement House Act, was enacted by the Legislature in order to assure "decent, standard and safe units of dwelling space" for the residents of this State. *N. J. S. A.* 55:13A–2.[10] To implement this salutary policy the Legislature has empowered the Commissioner of the Department of Community Affairs to promulgate such regulations as he deems necessary to assure safe construction and maintenance of hotels and multiple dwellings. *N. J. S. A.* 55:13A–7 (Supp. 1975–76) provides in part:

The commissioner shall issue and promulgate, in the manner specified in section 8 of this act, such regulations as he may deem necessary to assure that any hotel or multiple dwelling will be constructed and maintained in such manner as is consistent with, and will protect, the health, safety and welfare of the occupants or intended occupants thereof, or of the public generally.

Any such regulations issued and promulgated by the commissioner pursuant to this section shall provide standards and specifications for such construction, conversion and alteration and maintenance materials, methods and techniques, fire warning and extinguisher systems, elevator systems, emergency egresses, and such other pro-

---

10See also *Michaels v. Brookchester, Inc.,* 26 *N. J.* 379, 386 (1958), where we said with respect to the predecessor statute that the act "is comprehensive legislation intended to assure safe habitation, and it places responsibility where the Legislature has concluded it belongs." For a discussion of the new act in general, see Metzger, "Statewide Code Enforcement — New Jersey, the test case," 27 *Rutg. L. Rev.* 659 (1974).

tective equipment as the commissioner shall deem reasonably necessary to the health, safety and welfare of the occupants or intended occupants of any units of dwelling space in any hotel or multiple dwelling, including but not limited to:

\* \* \* \* \* \* \* \*

(f) Doors, and the manner of opening thereof. At the time of the instant break-in, the Commissioner had promulgated regulation *N. J. A. C.* 5:10–6.6(d) (7) (also published in: *Regulations for the Construction and Maintenance of Hotels and Multiple Dwellings,* N. J. Department of Community Affairs (July 19, 1968), Article 605 3(f) (2) (ii)), providing as follows:

Doors to dwelling units shall be equipped with a heavy duty lock set equipped with stopwork for control of the knob and an additional dead bolt or auxiliary latch bolt to prevent manipulation by means other than a key.[11]

Since the statute unquestionably applies to defendant's apartment complex,[12] and the regulations issued by the Commissioner have the force and effect of law, *N. J. S. A.* 55:13A–9, defendant's failure to supply plaintiff with a working "dead bolt or additional latch bolt" is a violation of a penal statute.

---

[11]The regulation has since been amended effective July 24, 1974, to be published in N. J. A. C. 5:10–6.6(d) (7). It now provides in part:

Entrance doors to dwelling units shall be equipped with a medium duty lock set (Series 160, Federal Specification FF–H–160a minimum) with a dead bolt action or a dead bolt lock separate from the latch set and a chain door guard so as to permit partial opening of the door.

See also Assembly Bill A–1299 (introduced March 18, 1974) which would empower the commissioner to adopt a uniform construction code to regulate the construction, alteration, and maintenance of buildings.

[12]*N. J. S. A.* 55:13A–3(k) (Supp. 1975-76) provides:

The term "multiple dwelling" shall mean any building or structure of one or more stories, and any land appurtenant thereto, and any portion thereof, in which three or more units of dwelling space are occupied, or are intended to be occupied by three or more persons who live independently of each other, provided that this definition shall not be construed to include any building or structure defined as a hotel in this act, or, registered as a hotel with the Commissioner of Community Affairs as hereinafter provided, or occupied or intended to be occupied exclusively as such.

In this State the violation of a statutory duty of care is not conclusive on the issue of negligence in a civil action but it is a circumstance which the trier of fact should consider in assessing liability. In *Horbal v. McNeil,* 66 *N. J.* 99 (1974), we said with respect to statutory traffic regulations:

The traffic regulations in the statute do not create separate causes of action for their violation but they do create standards of conduct violation of which a jury in a negligence action "should take into consideration" in arriving at their ultimate determination of negligence *vel non.* [66 *N. J.* at 103 (quoting *Phillips v. Scrimente,* 66 *N. J. Super.* 157, 163 (App. Div. 1961))][13]

Moreover, this principle has received specific recognition by this Court in the landlord-tenant context. In *Michaels v. Brookchester, Inc.,* 26 *N. J.* 379 (1958), a suit to recover for injuries sustained by a tenant in defendant's garden apartment complex who was struck by a cabinet door, we said with respect to the Tenement House Act:

Our statute does not expressly authorize a suit by one injured by reason of a landlord's violation and hence does not create a statutory cause of action as that term is understood. Rather, in harmony with our usual approach to statutes of this kind, the act is deemed to establish a standard of conduct, and to permit the intended beneficiaries to rely upon a negligent failure to meet that standard in a common law action for negligence. [26 *N. J.* at 386]

See also *Daniels v. Brunton,* 7 *N. J.* 102, 111 (1951); *Evers v. Davis,* 86 *N. J. L.* 196, 204 (E. & A. 1914). Since the Braitmans are unquestionably among the class for whose benefit the instant regulations were promulgated, and defendant's failure to comply with the regulation was the

---

[13] But see *Dolson v. Anastasia,* 55 *N. J.* 2 (1969), where the nature of the accident resulted in our conclusion that a driver's failure to maintain a reasonably safe distance from the vehicle *"is* negligence and a jury should be so instructed," despite the fact that this standard is incorporated in a traffic statute. 55 *N. J.* at 10 (emphasis in original).

efficient cause of their loss, *Evers, supra,* plaintiffs would have been entirely justified in invoking the Multiple Dwelling Law and the regulations promulgated thereunder as evidence of defendant's negligence.[14]

For the foregoing reasons, the judgment of the Appellate Division is affirmed.

## II

The observations contained in this point of the opinion represent the views of the writer, the Chief Justice and Justice Sullivan only.

Although we have concluded that the judgment below must be affirmed by resorting to familiar negligence concepts, a

---

[14]Although not effective at the time plaintiffs' apartment was robbed, it should be noted that *N. J. S. A.* 46:8–40 prohibits the owner of any multiple dwelling, defined in *N. J. S. A.* 46:8–38(b) as any building in which ten or more units of dwelling space are independently occupied, from doing any act which would make the tenant ineligible for crime insurance through the federal Housing and Urban Development Act of 1970, 12 *U. S. C. A.* § 1749bbb *et seq.* 12 *U. S. C. A.* § 1749bbb–10a(b), which provides in part:

[N]o such insurance shall be made available to a property which the Secretary determines to be uninsurable or to a property with respect to which reasonable protective measures to prevent loss, consistent with standards established by the Secretary, have not been adopted.

With respect to locks the minimum standards are set forth at 24 *C. F. R.* 1932.21:

§ 1932.21 Minimum standards for residences and apartments. In order to be eligible for Federal crime insurance, residential premises shall meet the following minimum standards:

(a) Each exterior doorway or doorway leading to garage areas, public hallways, terraces, balconies, or other areas affording easy access to the insured premises, shall be protected by a door which, if not a sliding door, shall be equipped with a dead lock using either an interlocking vertical bolt and striker, or a minimum ½-inch throw dead bolt, or a minimum ½-inch throw self-locking dead latch.

(b) All sliding doors, first floor and basement windows, and windows opening onto stairways, fire escapes, porches, terraces, balconies, or other areas affording easy access to the premises, shall be equipped with a locking device of any kind.

word of caution is necessary. It is undisputed that the problems of shelter in our modern society involve a variety of adequate goods and services. In its minimal interpretation, adequacy means secure windows and doors sufficient to safeguard the persons living in rented apartments and to safeguard their possessions. Suitable locks and sufficiently sturdy doors are as necessary to protect the person and property of tenants as are adequate light, plumbing, heating, sanitation and maintenance.

It is appropriate to observe that the depressing specter of rising crime rates in our urban areas may soon call for reconsideration of the general principle that the mere relationship of landlord and tenant imposes no duty on the landlord to safeguard the tenant from crime. Many prospective tenants undoubtedly consider the landlord's security measures in selecting apartments, particularly in middle and upper income complexes. A glance at any newspaper reveals that landlords frequently respond to this understandable concern by including references to their security measures in soliciting rentals. In light of the growing threat which crime poses to the urban dweller and the increasing reliance which must be placed upon multiple dwellings to meet contemporary housing needs, it may indeed soon be necessary to impose upon the landlord the contractual duty of taking reasonable precautions to safeguard his tenants from crimes committed in his apartment buildings.[15] We must be concerned with present and future living patterns. Whether this duty should be founded upon a frank recognition that the landlord is in a superior position to take the necessary precautions, *Kline, supra,* or whether the concept of an implied warranty of habitability of

---

[15]In another context, it was observed by the court in *Harris v. H. G. Smithy Co.,* 139 U. S. App. D. C. 65, 429 F. 2d 744, 746 (D. C. Cir. 1970):

    A landlord's duty of care must be measured by a flexible standard, that reflects community expectations and meets the needs of contemporary urban life.

residential premises engendered by *Marini v. Ireland,* 56 N. J. 130 (1970), is flexible enough to encompass appropriate security devices (facilities vital to the use of the premises), is a question we need not resolve today.[16]

We do not say that the landlord is an insurer of the security of the tenant's property. But he should take those measures of protection which are within his power to take and which will reduce the risk of criminals robbing tenants.

For present purposes, it is enough to say that in light of the developments to which we have alluded above, it may no longer be necessary to rely exclusively upon negligence principles to establish liability on the part of a residential landlord for loss to his tenants under facts such as those disclosed by this record.

Affirmed.

CLIFFORD and SCHREIBER, JJ. (concurring). We would decide this case on traditional and established negligence principles. There is no need to search for or rely upon any doctrine which expands the landlord's duty with respect to tenant security.

---

[16]Resort to the latter theory as a source of the landlord's duty to safeguard his tenant from crime in his building would, of course, require a reconsideration of the court's conclusion in *Dwyer v. Skyline Apartments, Inc.,* 123 N. J. Super. 48, 54–55 (App. Div. 1973), aff'd o. b. 63 N. J. 577 (1973) that:

The development of this new "bill of rights" for tenants, however, does not necessarily lead to the imposition of liability in tort on a landlord bottomed upon a concept of a continuing warranty of habitability. We are of the opinion that the language of the Supreme Court in the context of the narrow issue in *Marini* was not intended to overturn existing principles of law applicable to tort actions for personal injuries by tenants versus landlords. If the law is to be changed in that direction through a major extension of the rationale expressed in *Marini,* such determination is within the province of the Supreme Court, not within the ambit of power of the trial court or this intermediate appellate court.

For a critical discussion of *Dwyer,* see Note, 5 *Seton Hall L. Rev.* 409 (1974).

The landlord, Overlook Terrace Corp., which is a corporation organized under the Limited Dividend Housing Corporation Law, *N. J. S. A.* 55:61–1 *et seq.*, and was financed as a qualified housing sponsor in accordance with the New Jersey Housing Finance Agency Law, *N. J. S. A.* 55:14J–1 *et seq.*, had undertaken to furnish the plaintiffs' apartment with a heavy duty lock set equipped with stopwork for control of the knob and an additional deadbolt to prevent manipulation of the lock by means other than a key. This undertaking was made in accordance with the regulation promulgated by the Commissioner of the Department of Community Affairs, *N. J. A. C.* 5:10–6.6(d)(7), pursuant to the authority vested in him. *N. J. S. A.* 55:13A–7.

The duty thus visited upon the landlord is clear. The defendant's attorney in his supplemental letter to the Court acknowledged that the regulation imposed such a duty on the landlord, and the majority recognizes the same obligation. Since the landlord did not furnish the working lock as required, the violation of that obligation is beyond peradventure, and under these circumstances conclusively established negligence. *Dolson v. Anastasia,* 55 *N. J.* 2, 10 (1960); *Michaels v. Brookchester, Inc.,* 26 *N. J.* 379, 387 (1958).

There is yet another basis for the landlord's duty, still well within conventional negligence principles. Here, as the majority points out, plaintiff Nathan Braitman notified the defendant's management office of the defect in the lock (which defendant had undertaken to furnish for security purposes) and was assured it would be "taken care of." From this covenant implied in fact arose a duty on the part of the landlord to make the necessary repairs. Upon the non-performance thereof the landlord became liable to the tenants for consequential damages. *Michaels v. Brookchester, Inc., supra,* 26 *N. J.* at 285.

No matter, then, which of these well-established, traditionally-founded, long-recognized bases of the landlord's duty is relied upon here, it is clear that there was a violation

thereof, constituting negligence. From that negligence proximately flowed the consequential damages for which recovery was sought here, since the unreasonably enhanced hazard created by defendant's conduct was reasonably foreseeable and, as found by the trial judge, came to pass.

We concur in the judgment of affirmance.

CLIFFORD and SCHREIBER, JJ., concurring in the result.

*For affirmance*—Chief Justice HUGHES, Justices MOUNTAIN, SULLIVAN, PASHMAN, CLIFFORD and SCHREIBER and Judge CONFORD—7.

*For reversal*—None.