660 A.2d 1208

IRENEUSZ KUZMICZ, MARIE KUZMICZ, TADEUSZ WRONOWSKI AND HANNAH WRONOWSKI, PLAINTIFFS–RESPONDENTS, v. IVY HILL PARK APARTMENTS, DEFENDANT AND THIRD–PARTY PLAINTIFF–APPELLANT.

---

CITY OF NEWARK AND NEWARK BOARD OF EDUCATION, DEFENDANTS, v. GREAT ATLANTIC AND PACIFIC TEA COMPANY, INC., THIRD–PARTY DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued February 16, 1995—Decided July 3, 1995.

514

Before KING, D'ANNUNZIO and EICHEN, JJ.

*John Burke* argued the cause for appellant Ivy Hill Park Apts. (*Berlin, Kaplan, Dembling & Burke,* attorneys; *Mr. Burke,* on the brief).

*Joel C. Rinsky* argued the cause for respondent Ireneusz Kuzmicz (*Mr. Rinsky,* on the brief).

*James R. Connell* argued the cause for respondent Great Atlantic and Pacific Tea Company, Inc. (*Dwyer, Connell & Lisbona,* attorneys; *Paul J. Curreri,* on the brief).

The opinion of the court was delivered by

D'ANNUNZIO, J.A.D.

Defendant, Ivy Hill Park Apartments (Ivy Hill), appeals from a money judgment in favor of plaintiff entered on a jury verdict. Ivy Hill's third-party action against the Great Atlantic and Pacific Tea Company, Inc. (A & P) had been disposed of prior to trial by summary judgment in favor of A & P. Summary judgment was granted in favor of the City of Newark prior to trial.

The material facts were uncontroverted. Plaintiff, a Polish immigrant who came to the United States in 1986, was a tenant at an apartment complex owned and operated by defendant, Ivy Hill. In the evening of December 8, 1989, plaintiff and a companion were walking on an undeveloped lot from an A & P store to Ivy Hill when they were attacked by three unknown persons. Plaintiff was stabbed in the right chest, the left chest, and the right upper quadrant of his abdomen. Among other injuries, he suffered a laceration of the right ventricle of the heart which was characterized as a life-threatening injury. Plaintiff's liver was also lacerated.

The Newark Board of Education owned the lot on which the attack occurred. The Board's lot consisted of seven acres and was overgrown with brush and trees. It was strategically located between the Ivy Park Shopping Center (Shopping Center), where the A & P was a tenant, and a parking lot owned by Ivy Hill. The

parking lot was for the exclusive use of Ivy Hill tenants, such as the plaintiff. A chain link fence, erected by Ivy Hill, separated the parking lot from the Board's lot. There was a gap in the fence, and a jury could infer that the gap was created intentionally. The gap was wide enough for two persons to walk through it abreast. Photographs show that on each side of the gap, the chain link fencing terminated in a large structural member, a steel pole. It could be inferred that the opening was created to accommodate a gate. However, there was no gate. A path led from the gap across the Board's lot to the rear of the A & P at the Shopping Center. The path was an alternative route to the Shopping Center. Its use eliminated the need to use a longer route along public streets and sidewalks.

Donald Karas, a Newark policeman, was employed by Ivy Hill as a part-time security officer when plaintiff was stabbed. He testified that the path was approximately the length of a football field but varied in width. According to Karas, many tenants used the path to walk to the Shopping Center. He testified that the use of the path was continuous. According to Karas, Ivy Hill never instructed him to prevent people from using the path or to warn tenants not to use the path. Karas had, however, on occasion suggested to people whom he knew not to use the path in the dark.

Klaus Mangold was the manager of the Ivy Hill Park Apartments. He was aware that Ivy Hill tenants and employees used the path to travel between the parking lot and the Shopping Center. Plaintiff introduced into evidence letters from Mangold to the Newark Board of Education and to the City of Newark regarding the condition of the Board's lot. On October 24, 1985, Mangold wrote to the Mayor of Newark and described the Board's lot:

> The lot is overgrown with weeds and brush, is full of garbage, has no lighting at night, is not patrolled by the police and provides shelter for vermin of all types. The path through the lot is an extremely dangerous area: there has been a murder and dozens of muggings, including three of our employees, as well as some of our

tenants and visitors. The situation has grown progressively worse in the past week and shows no sign of being corrected.

Mangold suggested, as a remedy, that the City deed the lot to Ivy Hill.

Mangold wrote to the Board of Education on May 19, 1989. We reproduce the first three paragraphs of the letter:

For several years we have been deeply concerned about the conditions existing on the property owned by the Board of Education. The land in question is between our property and the Ivy Plaza shopping area, bordering Irvington Avenue; it is vacant and untended.

While neither the City of Newark, nor the Newark Board of Education, has the resources to adequately maintain or patrol vacant land, the area has been the site of several homicides, countless muggings, continual drug dealing, in addition to being used by youths and adults for drinking, and other activities. The overgrown conditions on the lot, together with the lack of removal of illicitly dumped garbage, creates a haven for rodents, and makes the lot an unsightly blight on the neighborhood. These conditions have a severely detrimental effect upon our complex and tenants.

We are enclosing herewith copies of our previous correspondence with the City, from which you will gather that we are extremely interested in acquiring this property since we are in the best position to develop and maintain this area. It is obviously in the best interests of the Board of Education, the City as a whole and this neighborhood in particular, to have the property change from a fiscally draining liability to tax-revenue-generating status.

Those letters established that Mangold, in his capacity as manager of Ivy Hill, was aware that the lot was a dangerous place. We note that the 1985 letter refers to "a murder," while the 1989 letter refers to "several homicides." A jury could infer, therefore, that the incidence of violence on the lot had increased between 1985 and 1989.

The evidence also established, through admissions by Ivy Hill, that Klaus Mangold was "the rental agent" for the Shopping Center, and that he "was in charge of the management" of the Shopping Center as well as the manager of Ivy Hill.

At the conclusion of the plaintiff's case, the Board of Education rested without presenting testimony or evidence. Defendant, Ivy Hill, read to the jury some deposition questions and answers, and then rested.

The jury determined that plaintiff was 20% negligent, the Board of Education was 30% negligent and Ivy Hill was 50% negligent. The jury awarded plaintiff damages in the amount of $175,000, and the court entered a molded judgment based on the jury's verdict.

The Board of Education did not appeal. Ivy Hill's core contention on appeal is that it could not be responsible for a criminal act occurring 'on property owned by another, and, therefore, the trial court erred in denying its pre-trial motion for summary judgment and its motion for involuntary dismissal. Ivy Hill also contends that the trial court erred in admitting evidence of Klaus Mangold's dual employment and in permitting plaintiff's counsel to comment on it during summation. Ivy Hill's third and final contention is that the trial court erred in not applying to Ivy Hill the ruling it made in granting third-party defendant A & P's motion for summary judgment. We affirm.

■ Generally, a private person has no duty to protect others from crime. *Braitman v. Overlook Terrace Corp.*, 68 *N.J.* 368, 375, 346 *A.*2d 76 (1975). But the general rule is not applicable to a landlord-tenant relationship. *Ibid.* Thus, our Supreme Court in *Braitman* held that "[a] residential tenant can recover damages from his landlord upon proper proof that the latter unreasonably enhanced the risk of loss due to theft by failing to supply adequate locks to safeguard the tenant's premises after suitable notice of the defect." *Id.* at 383, 346 *A.*2d 76. *See Kline v. 1500 Massachusetts Ave. Apartment Corp.*, 439 *F.*2d 477 (D.C.Cir.1970).

The Supreme Court revisited the issue of landlord liability for the criminal acts of others in *Trentacost v. Brussel*, 82 *N.J.* 214, 412 *A.*2d 436 (1980). Mrs. Trentacost was assaulted and robbed when she reached the top of a flight of stairs leading to her apartment. Plaintiff's apartment was one of eight in the building. Although a padlock secured the back entrance to the building, there was no lock restricting access to the building's front door. The Court affirmed a judgment in plaintiff's favor and, in defining the basis of landlord liability, stated:

> We reiterate that our holding in *Braitman* lies well within traditional principles of negligence law. "Negligence is tested by whether the reasonably prudent person at the time and place should recognize and foresee an unreasonable risk or likelihood of harm or danger to others." *Rappaport v. Nichols,* 31 *N.J.* 188, 201, 156 *A.*2d 1 (1959). If the reasonably prudent person would foresee danger resulting from another's voluntary, criminal acts, the fact that another's actions are beyond defendant's control does not preclude liability. (Citations omitted.) Foreseeability of harm, not the fact of another's intervention, is the crucial factor in determining "whether a *duty* exists to take measures to guard against [criminal activity]." *Goldberg* [*v. Newark Housing Auth.*], 38 *N.J.* [578] 583, 186 *A* 2d 291 [1962].

> [82 *N.J.* at 222–23, 412 *A.*2d 436.]

Applying those principles, the Court noted that criminal activity affecting the building was reasonably foreseeable due to evidence of a "high incidence of crime in the neighborhood," *id.* at 223, 412 *A.*2d 436, and of a prior attempted theft in the building. The Court ruled:

> Against this background, the jury could readily view the absence of a lock on the front entrance—an area outside an individual tenant's control—as exemplifying a callous disregard for the residents' safety in violation of ordinary standards of care. Since there was sufficient evidence for concluding that the mugging was a foreseeable result of the landlord's negligence, the jury's finding of liability was warranted.

> [*Ibid.*]

In *Butler v. Acme Markets, Inc.,* 89 *N.J.* 270, 445 *A.*2d 1141 (1982), the Supreme Court applied *Braitman* and *Trentacost* in affirming a judgment for the plaintiff who had been mugged in a supermarket parking lot. The evidence established a history of muggings in the parking lot prior to the attack on Mrs. Butler. A major element in the case against defendant was its failure to warn patrons of the possibility of a criminal attack. In that regard, the Court observed that "it was at least reasonable for the jury to determine that *absent warnings,* hiring one guard who primarily remained inside the store was an insufficient response in light of the known, repeated history of attacks on the premises." 89 *N.J.* at 280, 445 *A.*2d 1141. [Emphasis added.]

*Braitman, Trentacost,* and *Butler,* involved criminal activity on defendants' property. The present case is different. It involves injury as the result of criminal activity occurring on property not

owned by Ivy Hill. Ivy Hill contends that the difference is significant and precludes any duty on its part to protect its tenants from criminal activity on the Board's lot.

In advancing this argument, Ivy Hill relies in part on *MacGrath v. Levin Properties*, 256 *N.J.Super.* 247, 606 *A.*2d 1108 (App.Div.), *certif. denied*, 130 *N.J.* 19, 611 *A.*2d 656 (1992), and *Chimiente v. Adam Corp.*, 221 *N.J.Super.* 580, 535 *A.*2d 528 (App.Div.1987). In *MacGrath* we affirmed a summary judgment in favor of defendant. In that case, plaintiff, who had shopped at defendant's shopping center, ·was struck by a vehicle while walking across Route 22 in front of the shopping center. It was plaintiff's intention to cross Route 22 and walk to a bus stop approximately one-half mile away. In affirming the summary judgment, we ruled that "a property owner, who is otherwise without fault, owes no duty to pedestrians who are injured on an abutting highway or sidewalk which is part of the public domain." *MacGrath, supra*, 256 *N.J.Super.* at 250–51, 606 *A.*2d 1108. In *MacGrath*, we recognized only the exception established in *Stewart v. 104 Wallace Street, Inc.*, 87 *N.J.* 146, 432 *A.*2d 881 (1981), with regard to a commercial landowner's duty to maintain an abutting sidewalk in a reasonable manner.

*Chimiente, supra*, involved a plaintiff who fell on a grassy slope separating a sidewalk from a shopping center's parking lot. The grassy slope contained a twenty-foot long pathway connecting the sidewalk with the parking lot. The pathway had been established through the grass as a result of "the constant track of people going through it." *Chimiente, supra*, 221 *N.J.Super.* at 582, 535 *A.*2d 528. We affirmed an order dismissing plaintiff's complaint at the conclusion of plaintiff's case ruling that *Stewart v. 104 Wallace Street, supra*, "does not impose a duty upon commercial landowners to maintain contiguous lands owned by others simply because the public chooses to use the lands as a means of access to the commercial property." *Id.* at 583, 535 *A.*2d 528. *But cf. Warrington v. Bird*, 204 *N.J.Super.* 611, 499 *A.*2d 1026 (App.Div.1985) (ruling that a restaurant operator had a duty to provide reasonably safe passage for its patrons crossing a county road which

passed between the restaurant and the restaurant's parking lot), *certif. denied,* 103 *N.J.* 473, 511 *A.*2d 653 (1986); *compare Rockefeller v. Standard Oil Company of California,* 11 *Wash.App.* 520, 523 *P.*2d 1207 (1974) (ruling that gasoline station operator could be liable for hazardous condition on adjacent property, consisting of a deep ditch four feet from service station's boundary) *with Cothern v. LaRocca,* 255 *La.* 673, 232 *So.*2d 473 (1970) (holding that restaurant operator had no duty to protect patron from a hole on adjoining motel property where patron had parked before walking to restaurant).

■ We recognize that imposing a duty on Ivy Hill to take reasonable steps to protect its tenants from criminal activity on the Board's lot is an extension of New Jersey law. Indeed, the parties have not referred us to any cases from any jurisdiction which have imposed such a duty, and our research has found none. *See generally,* D.T. Landis, Annotation, *Liability Of Owner Or Operator Of Shopping Center, Of Business Housed Therein, For Injury to Patron or Premises From Criminal Attack By Third Party,* 93 *A.L.R.*3d 999 (1979); G.D. Spivey, Annotation, *Landlord's Obligation To Protect Tenant Against Criminal Activities Of Third Persons,* 43 *A.L.R.*3d 331 (1972); T.J. Goger, Annotation, *Liability Of Operator Of Business Premises To Patrons Injured By Condition Of Adjacent Property,* 39 *A.L.R.*3d 579 (1971); Fred C. Zacharias, *The Politics of Torts,* 95 Yale L.J. 698 (1985). We are persuaded, however, that such an extension is justified on the facts of this case.

It is uncontroverted that Ivy Hill was aware of the incidence of violent criminal activity on the Board's lot and, therefore, that its tenants who used the path across the lot were at risk of becoming victims of violent crimes. Despite this risk, Ivy Hill did not warn its tenants of the danger. To the contrary, Ivy Hill designed a gateway without a gate into the fence it erected. The jury could have concluded that tenants justifiably viewed the open gateway as an invitation to use the path to access the Shopping Center.

Ivy Hill argues that it had no duty to construct the fence and that the fence was no more of an invitation to use the Board's lot than a boundary line without a fence. We disagree. The fence with an open gateway focused attention on the path to which the opening gave access, and implied that it was appropriate to use the path.

The invitation to use the open gateway to access a shortcut to the Shopping Center interacted synergistically with the fact of Klaus Mangold's dual capacities as manager of the apartment complex and rental agent/manager of the Shopping Center. Affording tenants the convenience of a shortcut to the Shopping Center furthered Mangold's interests in both capacities. A jury could conclude that Ivy Hill constructively appropriated the path to facilitate access to the Shopping Center. Thus, this case combines a foreseeable risk of danger with a management executive who had the motivation to funnel tenants along the fence, through the gap, and onto the path.

We do not rule that Ivy Hill had a duty to police the Board's lot or otherwise make it safer by, for example, providing adequate lighting on it. The lot belonged to the Board of Education and Ivy Hill had no authority to enter the lot for those purposes. However, a jury could have found that Ivy Hill was negligent in failing to warn its tenants of the risk of injury due to criminal activity, or in failing to close the gap in the fence by installing a sturdy gate, or both.

■ We perceive no merit in Ivy Hill's second contention regarding the evidence of Klaus Mangold's dual employment. His employment by Ivy Hill and the Shopping Center supports an inference that as the chief on-site executive of both operations, Mangold had an interest in providing his tenants with the convenience of a shortcut to the Shopping Center and in promoting use of the Shopping Center. That interest was not dependent on establishing dual ownership of Ivy Hill and the Shopping Center, as to which the evidence was insufficient. Plaintiff's counsel did not suggest to the jury that it could infer dual ownership. He

suggested that the jury could infer an "economic interest" in not discouraging use of the shortcut. This suggestion was prefaced by his comment on Mangold's role as rental agent for the Shopping Center. We understand the comment to have been related to Mangold's interest as manager of both operations.

Ivy Hill's final contention is based on the grant of summary judgment to third-party defendant, A & P. The court granted summary judgment to A & P on the ground that "there is no viable theory of liability that would hold A & P liable for criminal acts or anti-social acts committed upon property which is not owned by it, over which it exercises no control, and has never given the appearances of exercising control." Ivy Hill contends that the rule of law the court applied to A & P should also apply to Ivy Hill. Alternatively, Ivy Hill argues that if it is liable, then A & P is also liable. Those contentions are without merit because the facts bearing on A & P's potential liability differed substantially from Ivy Hill's circumstances.

The first significant difference is the fact that A & P did not own the Shopping Center.[1] A & P was a sublessee of the original tenant, the Stop and Shop Companies, Inc. Stop and Shop was a tenant under a 1975 lease from the then owner of the Shopping Center, Colony Center Associates, a partnership. The record before the motion judge did not establish that A & P owned the fence adjacent to the Shopping Center's parking lot. The lease between Stop and Shop and the owners indicated that the owners had the duty to maintain all of the common facilities "in good order, repair and condition." Therefore, the motion judge could not find on this record that, to the extent A & P patrons were using holes in the fence to access the path leading to Ivy Hill, A & P had violated some obligation to maintain that fence. More important, however, is the absence of any evidence to establish that A & P had Ivy Hill's knowledge regarding criminal activity on

---

[1] Ivy Hill did not bring in the owner of the Shopping Center as a third party defendant.

the Board's lot. For those reasons, we are persuaded that the ruling applied to A & P was not applicable to Ivy Hill, and that the court did not err in granting A & P's summary judgment motion.

Affirmed.