688 A.2d 1018

IRENEUSZ KUZMICZ, MARIE KUZMICZ, TADEUSZ WRONOWSKI
AND HANNAH WRONOWSKI, PLAINTIFFS–RESPONDENTS,
v. IVY HILL PARK APARTMENTS, INC. A/K/A IVY HILL PARK
SECTION V, DEFENDANT AND THIRD PARTY PLAINTIFF–
APPELLANT.

CITY OF NEWARK AND NEWARK BOARD OF EDUCATION, DE-
FENDANTS, v. GREAT ATLANTIC AND PACIFIC TEA COMPA-
NY, INC., THIRD PARTY DEFENDANT–RESPONDENT, AND
JOHN DOE, THIRD PARTY DEFENDANT.

Argued March 11, 1996—Decided February 20, 1997.

*John Burke* argued the cause for appellant (*Berlin, Kaplan, Dembling & Burke,* attorneys).

*Joel C. Rinsky* argued the cause for respondents Ireneusz Kuzmicz, Marie Kuzmicz, Tadeusz Wronowski and Hannah Wronowski.

*Raymond R. Connell* argued the cause for respondent Great Atlantic & Pacific Tea Company, Inc. (*Dwyer, Connell & Lisbona,* attorneys).

The opinion of the Court was delivered by

POLLOCK, J.

Plaintiff Ireneusz Kuzmicz was a tenant of defendant Ivy Hill Park Apartments, Inc. (Ivy Hill), which owns an apartment complex in Newark. On the night of December 8, 1989, Kuzmicz was assaulted on a vacant lot owned by defendant Newark Board of Education (the Board). The lot is located between the complex and a grocery store owned by defendant Great Atlantic & Pacific Tea Company, Inc. (the A & P). The issue is whether under the circumstances of this case Ivy Hill owed Kuzmicz a duty to protect him by mending a bordering fence or warning him of the risk of assault on the Board's property.

The jury awarded Kuzmicz $175,000, apportioning liability: Kuzmicz twenty percent; the Board thirty percent; and Ivy Hill fifty percent. The Appellate Division affirmed. 282 *N.J.Super.* 513, 660 *A.*2d 1208 (1995). We granted Ivy Hill's petition for certification, 143 *N.J.* 322, 670 *A.*2d 1063 (1995), and now reverse.

I.

Seven to eight thousand people reside in the Ivy Hill apartment complex. Kuzmicz became a tenant in November 1986, approximately three years before the assault.

Adjacent to the Ivy Hill apartments is a seven-acre vacant lot owned by the Board. The lot was strewn with debris and overgrown with brush and trees. The lot was also the scene of occasional drug activity and other criminal conduct.

Ivy Hill built an eight-foot-high chain-link fence to separate its property from the lot. Over the course of several years, Ivy Hill repaired the fence three or four times. In 1987, the Board likewise repaired the fence.

On the opposite side of the lot, some 250 feet away, is a shopping plaza in which the A & P was a tenant. Ivy Hill did not own an interest in the plaza and derived no discernible economic benefit from it.

At approximately 7:30 p.m. on December 8, 1989, Kuzmicz and a friend were returning from the A & P to Kuzmicz's apartment. A lighted sidewalk runs from the shopping plaza to the apartment complex. Instead of using the sidewalk, they took a shortcut along a winding path through the unlighted and wooded lot. By cutting across the lot, tenants could reduce the walking time from ten to thirteen minutes to seven to eight minutes, a savings of three to six minutes. After Kuzmicz and his friend had crossed two thirds of the lot, assailants stabbed Kuzmicz, seriously injuring him.

Kuzmicz had used the path throughout his three-year tenancy. Starting the week after moving into his apartment, he walked on the path two or three times a week, sometimes at night. To gain access to the path, the tenants or someone else had cut an opening wide enough for two people to walk side-by-side through the fence. Kuzmicz testified that he did not know who owned the lot or whether anyone had been harmed while using the path. Furthermore, he stated that no one had ever told him not to use the path.

He knew, however, that in 1988, the opening had been closed by the installation of a new section of chain-link fence.

To patrol the apartment complex, Ivy Hill employed a security force, which included Donald Karas, a Newark police officer. Karas had told some residents to use the lighted sidewalks, instead of the darkened path.

Klaus Mangold, the administrator of the apartments, was aware that tenants and employees used the path to go to the shopping plaza, which also employed Mangold as a rental agent and manager. On behalf of Ivy Hill, Mangold wrote to the mayor of Newark and the superintendent of schools, complaining of the Board's failure to maintain the lot, of criminal activity on it, and of vandalism to Ivy Hill's fence. In a letter of October 24, 1985, Mangold wrote, in part:

> We are deeply disturbed by the condition of the vacant lot owned by the Board of Education of the City of Newark. This lot is between our back parking lot and the rear of the Ivy Plaza Shopping Center. Our fencing between the two properties is constantly vandalized by persons wishing to take a shortcut through the Board's property to the shopping center.
>
> The lot is overgrown with weeds and brush, is full of garbage, has no lighting at night, is not patrolled by the police and provides shelter for vermin of all types. The path through the lot is an extremely dangerous area: there has been a murder and dozens of muggings, including three of our employees, as well as some of our tenants and visitors. The situation has grown progressively worse in the past week and shows no sign of being corrected.

He also suggested that if Newark could not patrol the property, the city should convey it to Ivy Hill. In a letter of May 19, 1989, Mangold again complained of the lot's condition, repeated Ivy Hill's interest in acquiring it, and expressed concern over the Board's failure to maintain and patrol the lot. Twice between 1985 and the date of the attack, Newark notified the Board of its failure to remove debris and cut the grass.

In the Law Division, Ivy Hill and the A & P each moved for summary judgment under *Rule* 4:46. One judge denied Ivy Hill's motion, but another judge granted the A & P's motion. In granting the A & P's motion, the judge reasoned that the A & P did not have a duty of care that extended beyond the store to the

adjacent lot. The Law Division also granted summary judgment for Newark, but denied the Board's motion.

At trial, the court denied Ivy Hill's motion for an involuntary dismissal at the close of Kuzmicz's case. *See R.* 4:37–2. After the jury returned its verdict, the court denied Ivy Hill's motion for a judgment notwithstanding the verdict. *See R.* 4:40–2. The Board did not appeal.

The Appellate Division affirmed, holding that Ivy Hill had a duty of care to protect tenants from criminal activity on the Board's lot by warning them of that activity or by closing the gap in the fence. 282 *N.J.Super.* at 522, 660 *A.*2d 1208. The court recognized that it was making new law. *Id.* at 521, 660 *A.*2d 1208. Noting that Ivy Hill originally had "designed a gateway without a gate into the fence it erected," the court stated that "[t]he jury could have concluded that tenants justifiably viewed the open gateway as an invitation to use the path to access the Shopping Center." *Ibid.* This conclusion, coupled with Mangold's dual responsibilities, allowed the jury further to "conclude that Ivy Hill constructively appropriated the path to facilitate access to the Shopping Center." *Id.* at 522, 660 *A.*2d 1208. According to the court, from Mangold's dual employment, the jury could have inferred that Mangold had "an economic interest" in promoting and providing a shortcut to the plaza. *Id.* at 522–23, 660 *A.*2d 1208. Thus, the jury could have found that Ivy Hill had a duty to warn its tenants or close the gap by installing a "sturdy gate." *Id.* at 522, 660 *A.*2d 1208.

The Appellate Division also affirmed the grant of the A & P's motion for summary judgment, distinguishing the A & P from Ivy Hill. The court reasoned that as a tenant of the shopping plaza, the A & P did not have a duty to maintain a fence and that the evidence did not suffice to show that A & P knew of the criminal activity on the Board's lot. *Id.* at 523–24, 660 *A.*2d 1208.

## II.

■ Against this background, we consider whether Ivy Hill owed Kuzmicz a duty to protect him from the risk of assault on the Board's property. Our analysis begins with the fact that Kuzmicz was injured on land that Ivy Hill did not own or control. The question is whether Ivy Hill owed Kuzmicz a duty to protect him by warning him of the risk of off-premises criminal assaults or by making more exhaustive efforts to seal the fence.

In the related context of the duty of landowners for injuries that occur on their premises, the analysis no longer relies exclusively on the status of the injured party. Instead "[t]he issue is whether, 'in light of the actual relationship between the parties under all of the surrounding circumstances,' the imposition of a duty on the landowner is 'fair and just.'" *Brett v. Great Am. Recreation,* 144 *N.J.* 479, 509, 677 *A.*2d 705 (1996) (quoting *Hopkins v. Fox & Lazo Realtors,* 132 *N.J.* 426, 438, 625 *A.*2d 1110 (1993)). For off-premises liability, the issue is substantially the same. In both contexts, however, the analysis is fact-sensitive. *Hopkins, supra,* 132 *N.J.* at 439, 625 *A.*2d 1110.

Ultimately, the determination of the existence of a duty is a question of fairness and public policy. *Snyder v. American Ass'n of Blood Banks,* 144 *N.J.* 269, 292, 676 *A.*2d 1036 (1996); *Crawn v. Campo,* 136 *N.J.* 494, 501, 643 *A.*2d 600 (1994); *Dunphy v. Gregor,* 136 *N.J.* 99, 108, 642 *A.*2d 372 (1994); *Kelly v. Gwinnell,* 96 *N.J.* 538, 544, 476 *A.*2d 1219 (1984); *Goldberg v. Housing Auth.,* 38 *N.J.* 578, 583, 186 *A.*2d 291 (1962). Foreseeability of injury to another is important, but not dispositive. *Snyder, supra,* 144 *N.J.* at 292, 676 *A.*2d 1036; *Carter Lincoln–Mercury, Inc. v. EMAR Group,* 135 *N.J.* 182, 194, 638 *A.*2d 1288 (1994). Fairness, not foreseeability alone, is the test. Relevant to the determination of the fairness of the imposition of a duty on a landowner is the nature of the risk, the relationship of the parties, the opportunity to exercise care, and the effect on the public of the imposition of the duty. *Dunphy, supra,* 136 *N.J.* at 108, 642 *A.*2d 372; *Hop-*

kins, *supra*, 132 *N.J.* at 439, 625 *A.*2d 1110; *Goldberg, supra*, 38 *N.J.* at 583, 186 *A.*2d 291.

Consistent with that analysis, we have found a landlord liable to a tenant for damages resulting from a burglary when the landlord failed to replace a broken dead-bolt lock on the tenant's apartment. *See Braitman v. Overlook Terrace Corp.*, 68 *N.J.* 368, 346 *A.*2d 76 (1975). The apartment house was in an area where break-ins were common, and the landlord had assured the tenant that it would repair the lock. *Id.* at 371–73, 346 *A.*2d 76. Furthermore, a regulation of the Department of Community Affairs required the landlord to furnish a working lock. *Id.* at 383–84, 346 *A.*2d 76. In that context, we held, "[a] residential tenant can recover damages from his landlord upon proper proof that the latter unreasonably enhanced the risk of loss due to theft by failing to supply adequate locks to safeguard the tenant's premises after suitable notice of the defect." *Id.* at 383, 346 *A.*2d 76.

We likewise have imposed liability on a landlord who provides inadequate security for common areas of rental premises for the failure to prevent a criminal assault on a tenant. *See Trentacost v. Brussel*, 82 *N.J.* 214, 412 *A.*2d 436 (1980). In *Trentacost*, the apartment was in a high crime area. *Id.* at 218–19, 412 *A.*2d 436. Burglars and other unauthorized persons previously had broken into the building. *Id.* at 219, 412 *A.*2d 436. Contrary to an administrative regulation, the landlord had not installed a lock on the front entrance. *Id.* at 222, 412 *A.*2d 436. On those facts, we held that "[b]y failing to do anything to arrest or even reduce the risk of criminal harm to his tenants, the landlord effectively and unreasonably enhanced that risk." *Ibid.* We relied in part on the implied covenant of habitability in the lease and stated that "[t]he 'premises' which the landlord must secure necessarily encompass the common areas of multiple dwellings." *Id.* at 228, 412 *A.*2d 436. In both *Braitman* and *Trentacost*, the criminal act resulting in the imposition of liability on the landlord occurred in the apartment house.

Similarly, we have held that the owner of a supermarket may be liable to a customer who is mugged at night in the market's parking lot. *See Butler v. Acme Markets, Inc.*, 89 *N.J.* 270, 445 *A.*2d 1141 (1982). In *Butler*, unknown to the customer, seven muggings had occurred in the lot during the preceding year, five in the evenings during the four months preceding the attack in question. *Id.* at 274, 445 *A.*2d 1141. To combat the muggings, the market had hired off-duty policeman. *Ibid.* At the time of the attack, however, the only guard was inside the market; no one was on duty in the parking lot. *Id.* at 275, 445 *A.*2d 1141. In that setting, we held that the market had a duty to protect the customer from foreseeable criminal activity. *Id.* at 284, 445 *A.*2d 1141.

Uniting *Braitman, Trentacost,* and *Butler* is the premise that landlords and business owners should be liable for foreseeable injuries that occur on their premises. The underlying rationale is that they are in the best position to control the risk of harm. *See Butler, supra,* 89 *N.J.* at 284, 445 *A.*2d 1141. Ownership or control of the premises, for example, enables a party to prevent the harm. *Accord Steinmetz v. Stockton City Chamber of Commerce,* 169 *Cal.App.*3d 1142, 214 *Cal.Rptr.* 405, 408 (1985) (reasoning that duty is grounded in possession of premises and right to control and manage premises); *LaFleur v. Astrodome–Astrohall Stadium Corp.,* 751 *S.W.*2d 563, 565 (Tex.App.-Hous.1988) (holding that duty to provide protection arises from defendant's power of control). That rationale does not apply in the present case. Simply stated, existing precedent does not support the imposition of liability on Ivy Hill for Kuzmicz's injuries that occurred on the Board's property.

Courts from other states likewise have refused to impose liability on commercial landowners for off-premises murder or assault. *See, e.g., Steinmetz, supra,* 214 *Cal.Rptr.* at 408 (declining to impose liability because of difficulty in defining scope of any duty owed by landowner off premises and not controlled by him); *Wofford v. Kennedy's 2nd St. Co.,* 649 *S.W.*2d 912, 914 (Mo.Ct.

App.1983) (declining to impose liability on tavern owner for injuries suffered by patron assaulted on adjacent public street because otherwise "line which would cut off the landowner's liability becomes nearly impossible to draw").

Generally, a possessor of land is not liable for off-premises injuries merely because those injuries are foreseeable. *See, e.g., MacGrath v. Levin Properties,* 256 *N.J.Super.* 247, 606 *A.*2d 1108 (App.Div.1992), *certif. denied,* 130 *N.J.* 19, 611 *A.*2d 656 (1992); *Simpson v. Big Bear Stores Co.,* 73 *Ohio St.*3d 130, 652 *N.E.*2d 702, 705 (1995); *see generally Restatement (Second) of Torts* § 314A comment c (1965) (indicating possessor of land is not under duty to person endangered or injured when one has ceased to be an invitee). That general rule protects an abutting property owner from liability for injuries that occur on a public way. *See Restatement (Second) of Torts* § 349 (1965); *see also MacGrath, supra,* 256 *N.J.Super.* at 251–52, 606 *A.*2d 1108 (noting court follows *Restatement* § 349 unless exception applies). A narrow exception imposes liability on commercial landowners for injuries to pedestrians on abutting sidewalks. *See Stewart v. 104 Wallace St., Inc.,* 87 *N.J.* 146, 432 *A.*2d 881 (1981). The duty to maintain the sidewalks flows from the economic benefit that a commercial landowner receives from the abutting sidewalk and from the landowner's ability to control the risk of injury. *Id.* at 158, 432 *A.*2d 881; *Davis v. Pecorino,* 69 *N.J.* 1, 8, 350 *A.*2d 51 (1975) (holding gas station owner liable for injury caused by packed snow and ice on abutting sidewalk because "traffic was directly beneficial to his business and enured to his economic benefit").

Several decisions of the Appellate Division delineate the appropriate limits of a commercial property owner's liability for off-premises injuries. Critical to those decisions is the proposition that a landowner's liability may extend beyond the premises for activities that directly benefit the landowner. Thus, the owner of a shopping center was not liable to a woman who fell on a dirt path leading from the shopping center to a parking lot. *See Chimiente v. Adam Corp.,* 221 *N.J.Super.* 580, 535 *A.*2d 528

(1987). In *Chimiente*, sidewalks provided a safe alternative route. *Id.* at 584, 535 *A.2d* 528. The dirt path conferred no direct economic benefit on the shopping center. *Ibid.* Similarly, a shopping center on Route 22 was not liable to a customer who was struck by a car while crossing the highway. *See MacGrath, supra*, 256 *N.J.Super.* at 250–51, 253, 606 *A.2d* 1108. A restaurant that provided parking on the opposite side of the street, however, had a duty to provide safe passage from the lot to the restaurant. *See Warrington v. Bird*, 204 *N.J.Super.* 611, 499 *A.2d* 1026 (1985), *certif. denied*, 103 *N.J.* 473, 511 *A.2d* 653 (1986). The restaurant knew that its patrons would cross the street, and derived a direct economic benefit from their use of the path. *Id.* at 617, 499 *A.2d* 1026. Finally, a caterer was found liable for the death of a business invitee who was killed crossing a county highway after parking her car in a lot the caterer knew or should have known the invitee would use. *See Mulraney v. Auletto's Catering*, 293 *N.J.Super.* 315, 680 *A.2d* 793, *certif. denied*, 147 *N.J.* 263, 686 *A.2d* 764 (1996). Prominent among the reasons for the imposition of liability was the proposition that the use of the lot furthered the caterer's economic interest. *Id.* at 321, 680 *A.2d* 793. Critical to the imposition of liability is a direct economic benefit to the commercial landowner from the path taken by the injured party and the absence of an alternative route.

Courts from other states likewise have concluded that a landowner does not owe a duty to protect people from criminal activity on adjacent premises that the landowner does not own or control. *See, e.g., Donnell v. California Western School of Law*, 200 *Cal.App.*3d 715, 246 *Cal.Rptr.* 199, 201 (1988) (holding law school not liable merely because it took no action to remedy dangerous condition on adjoining property); *Steinmetz, supra*, 214 *Cal.Rptr.* at 408–09 (holding tenant in industrial park not liable to business invitee who was mugged a block away from tenant's premises but within park); *National Property Investors, II, Ltd. v. Attardo*, 639 *So.*2d 691 (Fla.Dist.Ct.App.1994) (holding no duty for store owner to protect customer from assault in apartment premises when assailant followed customer from convenience store to apartment

house across street); *Simpson, supra*, 73 *Ohio St.*3d 130, 652 *N.E.*2d 702 (holding supermarket owner's duty to warn or protect business invitees from foreseeable criminal activity extends to premises in possession and control of owner and therefore owner not liable for injuries suffered by patron attacked in common area of shopping center).

*Southland Corp. v. Superior Court*, 203 *Cal.App.*3d 656, 250 *Cal.Rptr.* 57 (1988), on which the dissent relies, *post* at 543, 688 *A.*2d at 1035, is consistent with that premise. In *Southland*, three assailants attacked a customer from a convenience store in a parking lot ten feet away from the store's property line. 250 *Cal.Rptr.* at 58. The customer sued the lessee and sub-lessee, who were the franchisor and franchisee of the store. *Id.* at 59. The master lease provided that the store could use the adjacent lot for parking, and the injured customer believed that the store controlled the lot. *Id.* at 58 n. 1, 59. Many customers parked in the lot. *Id.* at 58. The lessees did not erect a fence or do anything else to discourage the customers from using the lot. *Id.* at 59. Denying summary judgment for the lessee and sub-lessee, the court relied on the fact that the store controlled the lot and "realized a significant commercial benefit from their customers' use of the lot. . . ." *Id.* at 62–63. Absent a landlord's control of an adjacent lot or realization of "a significant commercial benefit" from tenants' use of the lot, the landlord does not owe a duty to warn tenants of the risk of criminal assault on the lot. *See ibid.* The facts of the present case do not satisfy either condition.

The Appellate Division drew a series of inferences in reaching the contrary conclusion that Ivy Hill derived an economic benefit from the tenants' use of the path. The court hypothesized that "the convenience of a shortcut to the Shopping Center furthered Mangold's interests in both capacities [as manager of the apartment complex and rental agent and manager of the Shopping Center]." 282 *N.J.Super.* at 522, 660 *A.*2d 1208. It further hypothesized that the assumed benefit to Mangold somehow ac-

crued to Ivy Hill's benefit and that "Ivy Hill constructively appropriated the path to facilitate access to the Shopping Center. Thus, this case combines a foreseeable risk of danger with a management executive who had the motivation to funnel tenants along the fence, through the gap, and onto the path." *Ibid.*

Absent is any reference to facts supporting the assumed economic benefit to Ivy Hill. The absence is understandable. Nothing in the record supports the conclusion that Ivy Hill benefitted economically from the tenants' use of the path.

This case reveals the tragic fact that life in inner cities can be dangerous. Contrary to the dissent's contention, *post* at 539–41, 688 *A.*2d at 1033–34, however, Ivy Hill's awareness of criminal activity on the Board's property does not suffice to impose liability on Ivy Hill for that activity. In effect, the dissent would transfer to an innocent property owner the duty to prevent criminal conduct that is more properly the responsibility of others.

Imposing on a landlord a duty to pay a tenant for injuries sustained in a criminal attack on another's property obviously helps to compensate the tenant. The imposition of the duty, however, transfers from one property owner to another the duty to compensate for injuries sustained on the property of the first owner. That duty carries costs, which provide a disincentive to own rental property in urban areas.

In appropriate circumstances, property owners may be liable if they negligently conduct activities that expose others to foreseeable criminal attacks. Here, for example, the jury understandably found the Board liable to Kuzmicz. The imposition of liability on the Board, however, does not justify imposing liability on Ivy Hill. The dissent's speculation that the negligence occurred on Ivy Hill's property does not withstand scrutiny. *Post* at 539–43, 688 *A.*2d at 1033. Kuzmicz was injured not because Ivy Hill failed to exercise due care on its property, but because the Board and others failed to prevent criminal activity on the Board's property.

On the facts of this case, we find unpersuasive the dissent's "distinction between foreseeability as a determinant of a defendant's duty of care and foreseeability as a determinant of whether a breach of duty is a proximate cause of the ultimate injury." *Post* at 532–33, 688 *A.*2d at 1029. Contrary to the dissent, *post* at 542–43, 688 *A.*2d at 1034–35, proximate cause is not at issue. The only issue before us is whether Ivy Hill owed a duty to Kuzmicz that extends to preventing or warning of criminal attacks on the Board's property. Foreseeability, although relevant, does not predetermine the issue of duty.

Critical to the dissent is the characterization of the fence opening on Ivy Hill's property as an unsafe and hazardous exit. *Post* at 541–42, 688 *A.*2d at 1034. The facts are to the contrary. Ivy Hill provided its tenants with a safe exit to the public sidewalks of Newark. It built a fence along its property line with the Board's property. On three or four occasions, Ivy Hill installed a section of chain-link fence to close the opening. On another occasion the Board welded a section of fence over the opening. If, as the Appellate Division contended, the open gateway may be viewed as an "invitation" to use the path on the Board's lot, 282 *N.J.Super.* at 521, 660 *A.*2d 1208, then the repeated sealing of the gateway by the installation of a chain-link fence, may be viewed as warning not to use that path.

Kuzmicz had lived in Ivy Hill for three years, and had used the path on numerous occasions. For his own convenience, he chose not to use the public sidewalks. Instead, he took a shortcut across the Board's property. Although his injuries are regrettable, they are not the result of any fault of Ivy Hill.

If Kuzmicz could recover from Ivy Hill because he was mugged on the Board's property while returning from the A & P, presumably he could recover also for injuries resulting from muggings on the Board's property while returning from work, the movies, the library, a restaurant, or a bar. The other eight thousand tenants likewise would be entitled to recover against Ivy Hill if they were injured as they crossed the Board's property. If the risk of

mugging was foreseeable on other properties in the area, how could the dissent deny recovery if tenants were mugged on those properties? In each instance, according to the dissent's theory, Ivy Hill would have breached a duty of care to the tenant by failing to warn of the risk of criminal activity or by failing to erect an impenetrable barrier between the other properties and the apartment house. To impose a duty on a landlord for the safety of tenants while on property over which the landlord has no control and from which it derives no benefit would be unprecedented. Precedent in this State and elsewhere supports the conclusion that under the circumstances of this case, the landlord does not owe a duty to the tenant for a criminal assault on the Board's property.

We empathize with the desire to compensate the victim of a criminal attack. That desire, however, should not predetermine the existence of the duty of a property owner for off-premises injuries. On these facts, it would be unfair to hold Ivy Hill liable to Kuzmicz for the failure to warn him of the possibility of an assault on the Board's path or for the failure to take greater measures to mend the fence. In so concluding, we do not foreclose the recognition of a landlord's duty to a tenant for off-premises injuries under different facts.

### III.

Because we find that Ivy Hill did not owe a duty to protect Kuzmicz by mending the fence or warning of the possibility of criminal assault on the Board's property, we need not resolve whether the Law Division's grant of summary judgment in favor of the A & P was inconsistent with the imposition of liability on Ivy Hill.

The judgment of the Appellate Division is reversed, and the matter is remanded to the Law Division for the entry of a judgment in favor of Ivy Hill.

STEIN, J., dissenting.

In this appeal we consider, in a unique factual context, the liability of an urban landlord to a tenant injured by third-party

criminal conduct on property immediately adjacent to the landlord's property. The alleged negligence consisted primarily of the landlord's failure to repair a more than six-year-old opening in a fence on its own property that led to a well-worn and regularly used path from the landlord's premises to a nearby shopping center. The proofs conclusively demonstrated the landlord's awareness that the property through which the path ran was the scene of numerous muggings, sexual assaults, and frequent violence for a number of years prior to the tenant's injury. The jury determined that the landlord had negligently failed to repair the fence to prevent tenants from using the path, and further determined that despite the intervening third-party criminal conduct the landlord's negligence constituted a proximate cause of the tenant's injury. The Appellate Division affirmed a jury verdict that imposed on the landlord fifty percent of the liability for the tenant's damages, the jury allocating thirty percent of the fault to the adjacent property owner and twenty percent to the tenant. We granted the landlord's petition for certification to consider its contentions that as a matter of law it owed no duty to its tenants to close the opening in the fence leading to the path, and even if it had such a duty the causal connection between its alleged negligence and its tenant's injury was insufficient as a matter of law to justify the imposition of liability.

Disregarding this Court's longstanding and consistently fact-oriented precedent in determining the existence of a legal duty, the majority reverses the judgment against Ivy Hill. It concludes as a matter of law that Ivy Hill breached no duty to plaintiff in failing to repair the fence opening on its own property that, as it knew, led to the path on the Board of Education lot that had been the scene of numerous muggings, robberies, and sexual assaults in recent years. Remarkably, the Court ignores the jury's conclusion that Ivy Hill's three or four unsuccessful attempts over six years to repair this fence opening did not adequately discharge Ivy Hill's duty to its tenants to eliminate an unsafe exit from its property.

Instead, the Court concludes as a matter of law that "Ivy Hill did not owe a duty to protect Kuzmicz by mending the fence or warning of the possibility of criminal assault on the Board's property." *Ante* at 523, 688 *A.*2d at 1024. The Court supports that legal conclusion by making its own findings of fact, rejecting the jury's conclusion that the fence opening on Ivy Hill's property was an unsafe and hazardous exit. The Court states: "The facts are to the contrary. Ivy Hill provided its tenants with a safe exit to the public sidewalks of Newark." *Ante* at 522, 688 *A.*2d at 1024. Putting to one side the Court's usurpation of the jury's function, the notion that the existence of a safe exit could excuse a landlord's duty to eliminate an unsafe exit is anomalous and unprecedented.

Throughout its opinion, the Court avoids reference to legal principles that define Ivy Hill's duty to eliminate an unsafe exit for its tenants. Rather, the Court prefers to focus its analysis on a friendlier but totally exaggerated target—whether, as the Court puts it, precedent supports the imposition of "liability on commercial landowners for off-premises murder or assault." *Ante* at 517, 688 *A.*2d at 1021. That overstatement of the legal issue is the majority opinion's recurrent theme. "Generally, a possessor of land is not liable for off-premises injuries merely because those injuries are foreseeable." *Ante* at 518, 688 *A.*2d at 1021. "[A] landowner does not owe a duty to protect people from criminal activity on adjacent premises that the landowner does not own or control." *Ante* at 519, 688 *A.*2d at 1022. "Imposing on a landlord a duty to pay a tenant for injuries sustained in a criminal attack on another's property obviously helps to compensate the tenant. * * * [However], [t]hat duty carries costs, which provide a disincentive to own rental property in urban areas." *Ante* at 521, 688 *A.*2d at 1023.

The Court's hyperbole rises to doomsday proportions when it cautions that "[i]f Kuzmicz could recover from Ivy Hill because he was mugged on the Board's property while returning from the A & P, presumably * * * [t]he other eight thousand tenants likewise

would be entitled to recover against Ivy Hill if they were injured as they crossed the Board's property." *Ante* at 522, 688 *A*.2d at 1024. The likelihood that other tenants might benefit from our decision did not deter this Court in *Trentacost v. Brussel*, 82 *N.J.* 214, 223, 412 *A*.2d 436 (1980), from imposing liability for criminal assault of a tenant on a landlord that provided inadequate security for common areas in rental premises, or in *Braitman v. Overlook Terrace Corp.*, 68 *N.J.* 368, 382–83, 346 *A*.2d 76 (1975), from imposing liability for theft from a residential tenant's apartment on a landlord that failed to supply adequate locks for the apartment's door. Those decisions were premised on this Court's recognition of a landlord's duty to take reasonable precautions for the protection of tenants, and were not influenced by forecasts about the number of tenants who might in the future recover judgments based on our holdings. Although our tort law jurisprudence may serve to identify the essential elements of a successful cause of action, its greater goal is to influence parties to take steps to protect those to whom they owe a duty of care.

The Court's overstatement of the issue attempts to shift the focus of the appeal to the generalized problem of urban landlords' liability for off-premises criminal assaults, and raises the false concern that to uphold this jury verdict exposes all urban property owners to liability for criminal assaults near their property. The former Essex County Assignment Judge who tried this case in the Law Division understood that the critical legal issue was much narrower: whether this specific landlord, thoroughly informed of the hazards confronting tenants electing to go through the fence opening and walk along the path on the Board of Education property, owed a duty to its tenants to eliminate or warn of the unsafe exit on its property?

The Court's rejection of the duty recognized by both lower courts is deeply troublesome. At best, it may reflect an isolated overreaction to the effect of a single jury verdict involving liability for a criminal assault in an urban neighborhood. At worst, it may reflect an unfortunate change of course away from this Court's

traditional jurisprudence pursuant to which the imposition of duty for purposes of negligence liability has been based on fact-specific considerations of fairness and public policy.

## I

The facts are not disputed. In 1986, Ireneusz Kuzmicz, a recent immigrant, moved into an apartment complex owned and operated by defendant Ivy Hill Park Apartments, Inc. The complex housed approximately eight thousand residents. Adjoining the back of Ivy Hill's property was an undeveloped, wooded lot owned by defendant Newark Board of Education. On the opposite side of the wooded lot was a shopping center in which was located an A & P supermarket operated by third-party defendant Great Atlantic and Pacific Tea Company, Inc. A well-worn footpath crossed the Board's lot, providing a shortcut between Ivy Hill's apartment complex and the supermarket.

A chain link fence that had been installed by Ivy Hill prior to 1985 bordered the rear of Ivy Hill's property and separated it from the wooded lot. To gain access to the path across the lot, tenants walked through an opening in Ivy Hill's fence that led directly to the path. The opening was wide enough for two persons to walk through side by side and appeared to have been created by someone cutting away or pulling apart a section of the fence between two supporting poles. Security guard Donald Karas, who had worked for Ivy Hill for approximately six years prior to the December 1989 assault on Kuzmicz, testified that the opening in the fence existed when he commenced his employment. He recalled only three or four instances during those six years when the opening in the fence was repaired or closed off by the installation of a new piece of fencing between the two poles, but stated that each time it was closed off the opening would eventually reappear. When the opening in the fence provided access, tenants frequently used the path to walk to and from the shopping center. Using that shortcut eliminated the need to use the public streets and sidewalks and shortened one's walk by about six

minutes. Approximately ten to fifteen tenants used the path each evening.

There were no warning signs posted on or near the fence and no one had ever told Kuzmicz not to use the path. Kuzmicz took the shortcut to the supermarket two or three times each week to shop for groceries and frequently saw other tenants using the path for the same purpose. In the year before he was attacked, Kuzmicz observed that the opening in the fence was temporarily closed for a week or two by a piece of chain link fencing that was attached to the existing fence with a few wires. During that period, he traveled to the A & P by a different route. Whenever the path was accessible, however, Kuzmicz walked to the shopping center by using the path. He did not know who owned the wooded lot, but assumed that Ivy Hill owned it because of the opening in the fence that led directly to the path. Prior to being assaulted, he was not aware of anyone being harmed while using the path.

Ivy Hill employed security guards to patrol and secure the apartment complex. Donald Karas, the Newark police officer employed as a part-time guard, patrolled the complex and responded to complaints by tenants. Ivy Hill never instructed Karas or any of its security guards to warn tenants and employees not to leave the complex by way of the opening in the fence. On occasion, however, Karas had suggested to people whom he knew personally that they should not use the path in the dark because it was unsafe and should instead use the lighted streets and sidewalks. Karas offered this advice based on his knowledge as a police officer that the wooded lot was dangerous.

Klaus Mangold managed the Ivy Hill apartment complex. He had been Ivy Hill's administrator since May 1975 and his office was located on the premises of the apartment complex for at least four years prior to the attack on Kuzmicz. Mangold was also employed as the rental agent and manager at the shopping center. Mangold knew that Ivy Hill tenants and employees used the path to travel between the apartment complex and the shopping center and had been doing so since prior to 1985. In response to a pre-

trial request for admissions, Ivy Hill admitted that it was aware, based on the knowledge of its agents and employees, that tenants used the opening in the fence to get to the A & P.

Mangold and Ivy Hill also knew that the wooded lot was dangerous. Prior to the assault on Kuzmicz, Mangold had written letters on Ivy Hill's behalf to the Mayor of Newark and the Newark Superintendent of Schools concerning the condition of the Board's lot. In his October 1985 letter to the Mayor, Mangold described the "extremely dangerous" nature of the lot and suggested that the City deed the lot to Ivy Hill to remedy the situation:

> We are deeply disturbed by the condition of the vacant lot owned by the Board of Education of the City of Newark. This lot is between our back parking lot and the rear of the Ivy Plaza Shopping Center. Our fencing between the two properties is constantly vandalized by persons wishing to take a shortcut through the Board's property to the shopping center.
>
> The lot is overgrown with weeds and brush, is full of garbage, has no lighting at night, is not patrolled by the police and provides shelter for vermin of all types. The path through the lot is an extremely dangerous area: there has been a murder and dozens of muggings, including three of our employees, as well as some of our tenants and visitors. The situation has grown progressively worse in the past week and shows no sign of being corrected.
>
> We would suggest that, if the City of Newark is unable and/or unwilling to adequately patrol, light and maintain the property, including clearing it of all brush, debris, garbage, etc., and thereby make it a safe environment for our tenants, visitors and staff, then the City should consider deeding it to Ivy Hill and we will gladly do so. . . .

In 1986 or 1987, employees of the Board of Education inspected the wooded lot and the fence that bordered Ivy Hill's property. The Board reported a hole in the fence to an Ivy Hill employee. In 1987, the Board's maintenance team repaired a hole in Ivy Hill's fence to stop people from entering the Board's lot from Ivy Hill's property. The Board also removed debris from the lot and installed some metal posts on the shopping-center side of the property to prevent people from backing trucks onto the lot to dump garbage. Prior to that, there had been a four- or five-foot fence separating the Board's property from the shopping center parking lot behind the A & P. Because unknown persons had driven trucks over the fence to dump trash, the Board installed

the metal posts to prevent further dumping. The fence, however, was never repaired.

In May 1989, Mangold wrote a second letter, this time to the Superintendent of Schools, to express Ivy Hill's continued concerns about the wooded lot and its ongoing interest in acquiring the property:

> For several years we have been deeply concerned about the conditions existing on the property owned by the Board of Education. The land in question is between our property and the Ivy Plaza shopping area, bordering Irvington Avenue; it is vacant and untended.
>
> While neither the City of Newark, nor the Newark Board of Education, has the resources to adequately maintain or patrol vacant land, the area has been the site of several homicides, countless muggings, continual drug dealing, in addition to being used by youths and adults for drinking, and other activities. The overgrown conditions on the lot, together with the lack of removal of illicitly dumped garbage, creates a haven for rodents, and makes the lot an unsightly blight on the neighborhood. These conditions have a severely detrimental effect upon our complex and tenants.
>
> We are enclosing herewith copies of our previous correspondence with the City, from which you will gather that we are extremely interested in acquiring this property since we are in the best position to develop and maintain this area. It is obviously in the best interests of the Board of Education, the City as a whole and this neighborhood in particular, to have the property change from a fiscally draining liability to tax-revenue-generating status.

A few months later, on December 8, 1989, at about 7:30 p.m., Kuzmicz and a friend were assaulted while walking back to Kuzmicz's apartment along the shortcut path after shopping at the A & P. They were about two-thirds of the way back along the path when two men suddenly appeared in front of them and blocked their way. Kuzmicz turned around and saw a third man blocking the path behind them. The three unknown assailants attacked and robbed Kuzmicz and his companion. Kuzmicz was stabbed at least three times and suffered lacerations of his heart and liver.

Kuzmicz sued defendants Ivy Hill, the Board of Education, and the City of Newark. Ivy Hill filed a third-party action for contribution against A & P. All defendants moved for summary judgment. Ivy Hill contended that it owed no duty to Kuzmicz in respect of criminal activity on the Board's property as a matter of law. The trial court denied Ivy Hill's summary judgment motion.

The court determined that issues of material fact were presented because a jury reasonably could conclude that Ivy Hill's failure to maintain its fence constituted a breach of its duty to tenants to provide a safe exit from its property, and that Ivy Hill's negligence was a proximate cause of plaintiff's injuries.

The court also denied the Board's summary judgment motion, but granted the City's summary judgment motion, because the Board, not the City, owned the wooded lot. Lastly, the court granted the summary judgment motion of A & P, "on the grounds that there [was] no viable theory of liability that would hold A & P liable for criminal acts or anti-social acts committed upon property which is not owned by it, over which it exercises no control, and has never given the appearance[ ] of exercising control."

The case was tried before a jury. At the conclusion of Kuzmicz's proofs, Ivy Hill moved for involuntary dismissal as a matter of law. The court denied the motion. The jury awarded Kuzmicz total damages of $175,000 and determined that Ivy Hill was fifty percent negligent, the Board was thirty percent negligent, and Kuzmicz was twenty percent negligent. The trial court molded the judgment in accordance with the verdict. Ivy Hill moved for judgment notwithstanding the verdict, or, in the alternative, a new trial on all issues. That motion was denied. Ivy Hill appealed.

Ivy Hill's primary contention on appeal was that it could not be responsible for a criminal 'act occurring on property of another. In response to that contention, the Appellate Division concluded that the uncontroverted evidence justified the imposition of liability on Ivy Hill. The court reasoned:

> It is uncontroverted that Ivy Hill was aware of the incidence of violent criminal activity on the Board's lot and, therefore, that its tenants who used the path across the lot were at risk of becoming victims of violent crimes. Despite this risk, Ivy Hill did not warn its tenants of the danger. To the contrary, Ivy Hill designed a gateway without a gate into the fence it erected. The jury could have concluded that tenants justifiably viewed the open gateway as an invitation to use the path to access the Shopping Center.

> Ivy Hill argues that it had no duty to construct the fence and that the fence was no more of an invitation to use the Board's lot than a boundary line without a fence.

We disagree. The fence with an open gateway focused attention on the path to which the opening gave access, and implied that it was appropriate to use the path.

\* \* \* \* \* \* \* \*

We do not rule that Ivy Hill had a duty to police the Board's lot or otherwise to make it safer by, for example, providing adequate lighting on it. The lot belonged to the Board of Education and Ivy Hill had no authority to enter the lot for those purposes. However, a jury could have found that Ivy Hill was negligent in failing to warn its tenants of the risk of injury due to criminal activity, or in failing to close the gap in the fence by installing a sturdy gate, or both.

[282 *N.J.Super.* 513, 521–22, 660 *A.2d* 1208 (1995) (citations omitted).]

The Appellate Division rejected Ivy Hill's further contention that the trial court should have applied to Ivy Hill the same rule of law that it applied to A & P. Ivy Hill argued that either Ivy Hill and A & P were both liable for Kuzmicz's injuries or neither was liable. The Appellate Division reasoned that "the facts bearing on A & P's potential liability differed substantially from Ivy Hill's circumstances." *Id.* at 523, 660 *A.2d* 1208. The court noted two differences in the facts applicable to the two defendants: first, although there was ample evidence of Ivy Hill's knowledge of the criminal activity on the wooded lot, there was no evidence that A & P shared that knowledge, *id.* at 523–24, 660 *A.2d* 1208, and second, the facts did not support an inference that A & P had a maintenance obligation in respect of the fence that bordered the shopping center because A & P did not own the shopping center premises or that fence and the relevant lease provisions expressly obligated the shopping center's owners, not A & P, to maintain common facilities. *Id.* at 523, 660 *A.2d* 1208. Based on those factual differences, the Appellate Division concluded that the trial court did not err in granting A & P's summary judgment motion.

## II

Before addressing the specific issue of Ivy Hill's duty to its tenants, which is influenced to some extent by the foreseeability of possible harm to tenants using the path on the adjacent lot, I note preliminarily the significant distinction between foreseeability as a determinant of a defendant's duty of care and foreseeability as a determinant of whether a breach of duty is a proximate cause of

the ultimate injury. Justice Clifford clearly articulated the distinction in *Hill v. Yaskin,* 75 *N.J.* 139, 143, 380 *A.*2d 1107 (1977):

> In order to ascertain the existence *vel non* of a duty owed by either defendant in the circumstances before us, it is necessary to determine whether or not probable harm to one in the position of this injured plaintiff, a police officer in pursuit of the stolen automobile, should reasonably have been anticipated from defendant's conduct. The issue of foreseeability in this sense must be distinguished from the issue of foreseeability as that concept may be said to relate to the question of whether the specific act or omission of the defendant was such that the ultimate injury to the plaintiff was a reasonably foreseeable result so as to constitute a proximate cause of the injury. Simply put, the distinction is between foreseeability as it impacts on duty determination and foreseeability as it is sometimes applied to proximate cause, a critical distinction too often (because too easily) overlooked. Professor Leon Green, in his tidy little *Rationale of Proximate Cause* (1927), characterizing the failure to make this distinction as "unpardonable" and productive of "interminable confusion," gives us a pointed comment from Salmond, *Law of Torts* at 144 (6th Ed.): "To treat as a question of remoteness what is really a question as to the existence of negligence or other fault is a fertile source of confusion." *Green,* op cit. at 82–83.

The *Hill* Court relied in part on the following explanation of the concept of foreseeability as a "duty" determinant:

> The probability of injury by one to the legally protected interest of another is the basis for the law's creation of a duty to avoid such injury, and foresight of harm lies at the foundation of the duty to use care and therefore of negligence. The broad test of negligence is what a reasonably prudent person would foresee and would do in the light of this foresight under the circumstances. Negligence is clearly relative in reference to the knowledge of the risk of injury to be apprehended. The risk reasonably to be perceived defines the duty to be obeyed; it is the risk reasonably within the range of apprehension, of injury to another person, that is taken into account in determining the existence of the duty to exercise care. In other words, damages for an injury resulting from a negligent act of the defendant may be recovered if a reasonably prudent and careful person should have anticipated, under the same or similar circumstances, that injury to the plaintiff or to those in a like situation would probably result. The most common test of negligence, therefore, is whether the consequences of the alleged wrongful act were reasonably to be foreseen as injurious to others coming within the range of such acts.

> [*Id.* at 144, 380 *A.*2d 1107 (quoting 57 *Am.Jur.2d Negligence* § 58 (1970)) (footnotes omitted).]

## A

In New Jersey,

> [t]he traditional common law approach to landowner or occupier tort liability ... is predicated on the status of the person on the property at the time of the injury. Historically, the duty of the owner or occupier to such a person is gauged by the right of that person to be on the land. That status is determined by which of three classifications applies to the entrant, namely, that of a business invitee, licensee, or trespasser.
>
> [*Hopkins v. Fox & Lazo Realtors*, 132 *N.J.* 426, 433, 625 *A*.2d 1110 (1993).]

As in other tort contexts, however, the overriding principle governing the determination of a duty is the general tort obligation to avoid foreseeable harm to others. *See, e.g., id.* at 438, 625 *A*.2d 1110; *Butler v. Acme Markets, Inc.,* 89 *N.J.* 270, 277, 445 *A*.2d 1141 (1982); *Wytupeck v. City of Camden,* 25 *N.J.* 450, 460–64, 136 *A*.2d 887 (1957); *Strang v. South Jersey Broadcasting Co.,* 9 *N.J.* 38, 45, 86 *A*.2d 777 (1952). Thus, in a landowner-liability case decided nearly a half-century ago, we said that "[t]he basis of liability is the foreseeability of harm, and the measure of duty is care in proportion to the foreseeable risk." *Strang, supra,* 9 *N.J.* at 45, 86 *A*.2d 777. Just last term we noted the settled principle that "the common-law classifications of persons on land should be applied flexibly in assessing the landowner's general tort obligation to avoid foreseeable harm to others." *Brett v. Great Am. Recreation, Inc.,* 144 *N.J.* 479, 508, 677 *A*.2d 705 (1996) (citing *Hopkins, supra,* 132 *N.J.* at 438–39, 625 *A*.2d 1110; *Butler, supra,* 89 *N.J.* at 275–77, 445 *A*.2d 1141).

Determining the scope of that obligation is the responsibility of the courts. *Wang v. Allstate Ins. Co.,* 125 *N.J.* 2, 15, 592 *A*.2d 527 (1991); *Kelly v. Gwinnell,* 96 *N.J.* 538, 552, 476 *A*.2d 1219 (1984). "The actual imposition of a duty of care and the formulation of standards defining such a duty derive from considerations of public policy and fairness." *Hopkins, supra,* 132 *N.J.* at 439, 625 *A*.2d 1110; *accord Snyder v. American Assoc. of Blood Banks,* 144 *N.J.* 269, 292, 676 *A*.2d 1036 (1996); *Carvalho v. Toll Bros. & Developers,* 143 *N.J.* 565, 572, 675 *A*.2d 209 (1996); *Crawn v. Campo,* 136 *N.J.* 494, 503, 643 *A*.2d 600 (1994); *Dunphy v. Gregor,* 136 *N.J.* 99, 110, 642 *A*.2d 372 (1994). A fundamental purpose of tort law is to deter conduct that creates an unreasonable risk of injury to others. *E.g., Hopkins, supra,* 132 *N.J.* at 448, 625 *A*.2d

1110; *People Express Airlines, Inc. v. Consolidated Rail Corp.,* 100 *N.J.* 246, 255, 495 *A.*2d 107 (1985). "[F]orcing tortfeasors to pay for the harm they have wrought provides a proper incentive for reasonable conduct." *Weinberg v. Dinger,* 106 *N.J.* 469, 487, 524 *A.*2d 366 (1987).

> Ability to foresee injury to a potential plaintiff does not in itself establish the existence of a duty, *see [Goldberg v. Housing Auth.,* 38 *N.J.* 578, 583, 186 *A.*2d 291 (1962) ], but it is a crucial element in determining whether imposition of a duty on an alleged tortfeasor is appropriate. *See Hill v. Yaskin,* 75 *N.J.* 139, 143–44 [380 *A.*2d 1107] (1977) (discussing "foreseeability as a 'duty' determinant"). Subsumed in the concept of foreseeability are many of the concerns we acknowledge as relevant to the imposition of a duty: the relationship between the plaintiff and the tortfeasor, the nature of the risk, and the ability and opportunity to exercise care.

> [*Carter Lincoln–Mercury, Inc. v. EMAR Group, Inc.,* 135 *N.J.* 182, 194, 638 *A.*2d 1288 (1994).]

"Once the foreseeability of an injured party is established, we must decide whether considerations of fairness and policy warrant the imposition of a duty." *Id.* at 194–95, 638 *A.*2d 1288. Thus, "[a]lthough a foreseeable risk is the indispensable cornerstone of any formulation of a duty of care, not all foreseeable risks give rise to duties." *Dunphy, supra,* 136 *N.J.* at 108, 642 *A.*2d 372; *see Weinberg, supra,* 106 *N.J.* at 485, 524 *A.*2d 366; *Kelly, supra,* 96 *N.J.* at 544, 476 *A.*2d 1219. The inquiry "involves identifying, weighing, and balancing several factors—the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution." *Hopkins, supra,* 132 *N.J.* at 439, 625 *A.*2d 1110 (citing *Goldberg, supra,* 38 *N.J.* at 583, 186 *A.*2d 291); *see Snyder, supra,* 144 *N.J.* at 292, 676 *A.*2d 1036; *Carvalho, supra,* 143 *N.J.* at 573, 675 *A.*2d 209; *Crawn, supra,* 136 *N.J.* at 503, 643 *A.*2d 600; *Dunphy, supra,* 136 *N.J.* at 108, 642 *A.*2d 372. The court must determine "whether, 'in light of the actual relationship between the parties under all of the surrounding circumstances,' the imposition of a duty on the landowner is 'fair and just.'" *Brett, supra,* 144 *N.J.* at 509, 677 *A.*2d 705 (quoting *Hopkins, supra,* 132 *N.J.* at 438, 625 *A.*2d 1110).

Twenty years ago we recognized that under certain conditions a duty properly could be imposed on residential landlords to safeguard tenants' premises against criminal acts by third persons. *See Braitman, supra,* 68 *N.J.* at 380, 346 *A.*2d 76 (" '[N]egligence may consist in the creation of a situation [that] involves unreasonable risk because of the expectable action of another.' " (quoting *Rappaport v. Nichols,* 31 *N.J.* 188, 201, 156 *A.*2d 1 (1959))). We revisited the issue of landlord liability for the criminal acts of others in *Trentacost, supra,* 82 *N.J.* 214, 412 *A.*2d 436. There, the tenant sued her landlord to recover for injuries the tenant sustained when she was assaulted and robbed in a hallway of her apartment building. We affirmed a judgment in favor of the plaintiff and based our holding, in part, on "traditional principles of negligence law." *Id.* at 222, 412 *A.*2d 436. We stated:

> We reiterate that our holding in *Braitman* lies well within traditional principles of negligence law. "Negligence is tested by whether the reasonably prudent person at the time and place should recognize and foresee an unreasonable risk or likelihood of harm or danger to others." *Rappaport v. Nichols,* 31 *N.J.* 188, 201 [156 *A.*2d 1] (1959). If the reasonably prudent person would foresee danger resulting from another's voluntary, criminal acts, the fact that another's actions are beyond defendant's control does not preclude liability. Foreseeability of harm, not the fact of another's intervention, is the crucial factor in determining "whether a *duty* exists to take measures to guard against [criminal activity]." *Goldberg,* 38 *N.J.* at 583, 186 *A.*2d 291.
>
> [*Trentacost, supra,* 82 *N.J.* at 222–23, 412 *A.*2d 436 (alteration in original) (citations omitted).]

In *Butler v. Acme Markets, Inc.,* 89 *N.J.* 270, 276, 445 *A.*2d 1141 (1982), we held that the principles established in *Braitman* and *Trentacost* were applicable to a case involving a criminal attack in a supermarket parking lot. The evidence at trial established a history of muggings in the parking lot prior to the attack on the plaintiff. Although the plaintiff had shopped at the store regularly for a number of years, she was unaware of the prior attacks on shoppers. The defendant employed off-duty police officers to patrol inside and outside the store, but only one officer was on duty at a time. No signs were posted warning patrons about the possibility of criminal attack. The plaintiff claimed that the supermarket had been negligent in failing to warn her of the risk

of criminal activity and in failing to provide a safe place in which to shop and park. The jury returned a verdict for the plaintiff. On the defendant's motion for judgment notwithstanding the verdict, the trial court entered judgment in favor of the defendant. The Appellate Division reversed and we affirmed. We stated:

> While [*Braitman* and *Trentacost*] involved the relationship of landlord and tenant, their principles are equally applicable to the responsibility of commercial shopkeepers.... Owners and occupiers of land make up the largest single group upon whom the duty of affirmative conduct has been imposed. The historical classifications of the degrees of care owing to visitors upon land are undergoing gradual change in the law in favor of a broadening application of a general tort obligation to exercise reasonable care against foreseeable harm to others.
> [*Id.* at 276–77, 445 *A.*2d 1141 (citation omitted).]

We concluded that "a shopkeeper's liability under these circumstances is properly based upon familiar negligence concepts.... Foreseeability of the risk that criminal acts of others would cause harm is the crucial factor." *Id.* at 275–76, 445 *A.*2d 1141. We held that it was fair to impose a duty on the shopkeeper under the circumstances, because the shopkeeper was "in the best position to provide either warnings or adequate protection for its patrons ... and because the public interest lies in providing a reasonably safe place for a patron to shop." *Id.* at 284, 445 *A.*2d 1141.

We have also imposed a duty on landowners in respect of injuries that occur *outside* the premises. We have held that where a landowner's activity invites the use of adjoining property to its commercial advantage or for its special benefit, fairness justifies the imposition of liability for injuries occurring beyond the boundaries of the owner's premises. *See Stewart v. 104 Wallace St., Inc.*, 87 *N.J.* 146, 157, 432 *A.*2d 881 (1981) (imposing duty on commercial landowners to maintain abutting public sidewalks in "reasonably good condition" to prevent injuries to pedestrians); *Davis v. Pecorino*, 69 *N.J.* 1, 4–5, 350 *A.*2d 51 (1975) ("An abutting landowner is responsible for dangerous conditions created as a result of his special use of the public sidewalk for his particular benefit.").

Relying on our decision in *Stewart, supra,* the Appellate Division determined that a commercial proprietor could be found liable

for injuries to its patrons struck by a car on an adjacent roadway that provided access to the premises. *Warrington v. Bird,* 204 *N.J.Super.* 611, 499 *A.*2d 1026 (1985), *certif. denied,* 103 *N.J.* 473, 511 *A.*2d 653 (1986). The defendant in that case, a restaurant operator, owned property on both sides of a poorly-lit public road; the restaurant was situated on one side and the parking lot on the other. The plaintiffs were injured while crossing the road to return to their cars after dining. The court held that the landowner was obligated "to exercise reasonable care for the safety of its patrons" and had a duty not to subject them "to an unreasonable risk of harm in traversing the expected route between the two locations." *Id.* at 617, 499 *A.*2d 1026.

> [T]he critical element should not be the question of the proprietor's control over the area to be traversed but rather the expectation of the invitee that safe passage will be afforded from the parking·facility to the establishment to which they are invited. Commercial entrepreneurs know in providing the parking facility that their customers will travel a definite route to reach their premises. The benefiting proprietor should not be permitted to cause or ignore an unsafe condition in that route which it might reasonably remedy, whether the path leads along a sidewalk or across a roadway.
>
> ... [T]he question of control of the roadway has little bearing.... [I]f the dangers reasonably required, a sign or flashing signal might have been erected on defendant's premises to alert both motorists and patrons of the dangers.
>
> [*Ibid.*]

The decisive factor in the determination of the duty in *Warrington* was that the landowner had invited the use of the unsafe crossing in disregard of the foreseeable risk to its invitees. More significant than the defendant's lack of ownership of the adjacent property was its ability to prevent the harm that occurred there. Other cases are in accord. *See, e.g., Gunlock v. Gill Hotels Co.,* 622 *So.*2d 163, 164 (Fla.Dist.Ct.App.1993) (holding that hotel owner "owed a duty to exercise reasonable care for the safety of its invitees in passing over the highway to and from ... hotel facilities"); *Lutheran Hosp. of Indiana, Inc. v. Blaser,* 634 *N.E.*2d 864, 870–71 (Ind.Ct.App.1994) (holding that hospital owed duty to guard against foreseeable injuries caused by car striking pedestrian in public right-of-way adjacent to hospital's parking lot where evidence indicated that hospital permitted pedestrians and vehi-

cles to enter lot in unsafe manner); *Tryon v. City of Lowell*, 29 *Mass.App.Ct.* 720, 565 *N.E.*2d 456, 457–58 (1991) (holding that city's duty to protect school children from injury could extend to dangers on adjacent railroad property where record indicated that city employees knew that children regularly crossed railroad tracks to enter city's school property by climbing through hole in city's defective fence); *see also Dumas v. Pike County*, 642 *F.Supp.* 131, 136 (S.D.Miss.1986) ("The duty of an occupier or owner of a premises to an invitee can extend to the entrance of the property [and] to a safe exit after the purpose of the visit is concluded. . . . If the landowner treats the neighbor's property as an integral part of his, the lack of formal title is immaterial [to the imposition of the duty]."); *Ollar v. Spakes*, 269 *Ark.* 488, 601 *S.W.*2d 868, 870–71 (1980) ("[B]efore extraterritorial liability attaches, it must be shown that the owner or operator had actual or constructive knowledge of the danger of injury to his invitees. When an owner or operator learns or should have learned of a dangerous condition existing adjacent to his property and fails to attempt to correct the condition or warn the invitees of such danger, he is guilty of negligence."); *Southland Corp. v. Superior Court*, 203 *Cal.App.*3d 656, 250 *Cal.Rptr.* 57, 60 (1988) (holding that store owner was not entitled to summary judgment on ground that it did not own adjacent land where patron was harmed in criminal assault because triable issues of fact existed concerning foreseeability of criminal attack and store owner's exercise of "actual or apparent control" of adjacent land); *Gayden v. City of Rochester*, 148 *A.D.*2d 975, 539 *N.Y.S.*2d 211, 212 (1989) (holding that landowner owes "duty to exercise reasonable care in the maintenance of its property to prevent foreseeable injury that might occur on the adjoining property" and therefore owner of property adjacent to concrete waterway could be liable for drowning death of child where owner failed to repair hole in fence on its property through which children climbed to get to adjacent waterway property); *Andrick v. Town of Buckhannon*, 187 *W.Va.* 706, 421 *S.E.*2d 247, 251–52 (1992) (discussing cases in which courts have recognized that landowner's duty to business invitees may

extend beyond premises where landowner knows that invitees regularly use adjacent property in connection with business invitation and also knows that such use exposes invitees to risk of injury).

In sum, the scope of a landlord's duty to exercise due care to prevent foreseeable harm to tenants is defined not only by the precise boundaries of its premises but also by what is reasonable and fair, under the totality of the circumstances. A landlord acts negligently if it fails to take reasonable measures to protect its tenants from foreseeable, preventable harm. "To act non-negligently is to take reasonable precautions to prevent the occurrence of foreseeable harm to others. What precautions are 'reasonable' depends upon the risk of harm involved and the practicability of preventing it." *Weinberg, supra,* 106 *N.J.* at 484, 524 *A.*2d 366; *see People Express, supra,* 100 *N.J.* at 267, 495 *A.*2d 107; *Wytupeck, supra,* 25 *N.J.* at 461, 136 *A.*2d 887.

### B

Breach of a duty of care is but one element in determining a defendant's liability. "Liability depends not only on the breach of a standard of care but also on a proximate causal relationship between the breach of the duty of care and resultant losses." *People Express Airlines, Inc. v. Consolidated Rail,* 100 *N.J.* 246, 264, 495 *A.*2d 107 (1985). We have defined proximate cause as that combination of "logic, common sense, justice, policy and precedent" that fixes a point in a chain of events, some foreseeable and some unforeseeable, beyond which the law will bar recovery. *Ibid.* (quoting *Powers v. Standard Oil Co.,* 98 *N.J.L.* 730, 734, 119 *A.* 273 (Sup.Ct.1923), *aff'd o.b.,* 98 *N.J.L.* 893, 121 *A.* 926 (E. & A.1923)). Ordinarily, issues of proximate cause are considered to be jury questions. *See Martin v. Bengue, Inc.,* 25 *N.J.* 359, 374, 136 *A.*2d 626 (1957). However, in unique cases our courts have rejected the imposition of liability as a matter of law for highly extraordinary consequences. *See, e.g., Caputzal v. The Lindsay Co.,* 48 *N.J.* 69, 77–80, 222 *A.*2d 513 (1966) (holding that even if

defect in water softener caused rusty discoloration of water, manufacturer was not liable to plaintiff who sustained idiosyncratic and highly extraordinary heart attack brought on by fright at sight of discolored water); *Glaser v. Hackensack Water Co.*, 49 *N.J.Super.* 591, 597, 141 *A.*2d 117 (App.Div.1958) (holding that water company whose employee entered plaintiff's garage without notice to read meter was not liable to plaintiff who became frightened for safety of infant daughter and injured herself while running downstairs).

The *Restatement (Second) of Torts* includes this characterization of the principle of non-liability for highly extraordinary consequences: "The actor's conduct may be held not to be a legal cause of harm to another where after the event and looking back from the harm to the actor's negligent conduct, it appears to the court highly extraordinary that it should have brought about the harm." *Restatement (Second) of Torts* § 435(2).

### III

The question whether Ivy Hill failed to take reasonable security measures on its premises for the protection of its tenants was properly submitted to the jury. I reach that conclusion on the basis of the unique facts presented by this record.

The majority observes that commercial landlords ordinarily have no liability to tenants injured by criminal attacks that occur outside of the leased premises. *Ante* at 517–19, 688 *A.*2d at 1021–22. But that broad principle of non-liability is based on the common assumption that the danger of criminal assault is so generalized that it would be unfair and impractical to require landlords to institute precautionary measures to guard against so pervasive a hazard.

The hazard of criminal assault presented by this record is significantly more confined. Irrespective of the generalized danger of criminal assault in its immediate neighborhood, Ivy Hill possessed extensive information about the specific recurring hazard of criminal assaults on the adjacent Board of Education lot.

So seriously did Ivy Hill view that hazard that it offered to take title to the property from the Newark Board of Education in order to eliminate the conditions that stimulated the criminal activity. Moreover, Ivy Hill's knowledge concerning criminal activity on the lot undoubtedly was greater than that of its tenants. Kuzmicz, for example, testified that he had no prior knowledge of any criminal activity on the Board of Education property.

In that context, the fence opening on Ivy Hill's property, which tenants routinely used for access to the path leading to the shopping center, could be found by a jury to constitute a particularly unsafe and hazardous exit from Ivy Hill's property. The hazard to tenants using that unsafe exit was not merely the generalized risk of criminal activity in the neighborhood, but rather the specific, recurring, and localized danger of the criminal activity on the lot attendant to its overgrown and neglected condition. Not only was Ivy Hill fully informed of that danger, but it also was informed of its tenants' longstanding practice of using the break in the fence on its property as a means of access to the path through the lot in order to reach the shopping center. It knew of the hazard for those exiting its property by that route.

The trial court correctly instructed the jury that Ivy Hill had no duty to maintain or patrol the Board of Education lot notwithstanding the danger it presented to its tenants. In addition, the court correctly instructed the jury that Ivy Hill had a duty to take reasonable security measures *on its own premises* for the protection of its tenants, requiring the jury to decide whether Ivy Hill had failed to discharge that duty.

On this record, whether Ivy Hill adequately discharged its duty to plaintiff and its other tenants clearly was an issue for the trier of fact. A reasonable jury surely could have determined that the exit from the fence opening to the Board of Education lot was extremely hazardous, especially to tenants using the path at night, and that Ivy Hill had a duty to eliminate the hazardous exit by permanently sealing the fence opening, or to reduce the hazard by posting a warning. To conclude, as does the majority, that this

record presented no triable issue of fact on whether Ivy Hill breached a duty to its tenants would repudiate a substantial body of our decisional law that predicates the imposition of a duty on the relationship of the parties, foreseeability of the risk to be avoided, and the opportunity to exercise due care. *Carter Lincoln–Mercury v. EMAR, supra*, 135 *N.J.* at 194, 638 *A.*2d 1288.

The trial court further instructed the jury that if it found that Ivy Hill failed to take reasonable security measures on its premises to protect its tenants, it should then determine whether that failure was a proximate cause of plaintiff's injuries. I have no doubt that the proximate cause issue also presented a jury question. Unlike the highly extraordinary consequence that led this Court in *Caputzal, supra*, 48 *N.J.* at 79–80, 222 *A.*2d 513, to conclude that defendant had no liability as a matter of law for the plaintiff's injuries, the consequence of Ivy Hill's failure permanently to close its fence was quite foreseeable and readily to be anticipated. The assault on Kuzmicz cannot be viewed as a "highly extraordinary" consequence, see *Restatement (Second) of Torts* § 435(2), merely because it resulted from criminal conduct by unknown third parties. "If the reasonably prudent person would foresee danger resulting from another's voluntary criminal acts, the fact that another's actions are beyond defendant's control does not preclude liability." *Trentacost, supra*, 82 *N.J.* at 222, 412 *A.*2d 436. From Ivy Hill's perspective, based on its superior knowledge, the potential for criminal assaults on tenants using the path on the Board of Education lot was highly foreseeable.

Ivy Hill relies principally on *MacGrath v. Levin Properties*, 256 *N.J.Super.* 247, 606 *A.*2d 1108 (App.Div.), *certif. denied*, 130 *N.J.* 19, 611 *A.*2d 656 (1992), and *Chimiente v. Adam Corp.*, 221 *N.J.Super.* 580, 535 *A.*2d 528 (App.Div.1987), to argue that it owed no duty to Kuzmicz to protect him from harm on the adjacent property. Those cases hold that a commercial proprietor generally owes no duty to provide its invitees safe passage across adjacent land, but their factual context differs significantly from the facts critical to our resolution of this appeal. In *MacGrath*, a

shopping center patron was struck by a car while crossing a public road after leaving the shopping center's property. The Appellate Division affirmed a grant of summary judgment in favor of the shopping center's owner on the ground that "a property owner, *who is otherwise without fault,* owes no duty to pedestrians who are injured on an abutting highway or sidewalk which is part of the public domain." *MacGrath, supra,* 256 *N.J.Super.* at 250–51, 606 *A.2d* 1108 (emphasis added). The facts in *MacGrath* did not suggest that the landowner had superior knowledge of the danger of crossing the adjacent road or that the danger was anything but patent. Likewise, in *Chimiente* the Appellate Division held that the owner of a shopping center parking lot had no duty to maintain a dirt pathway across contiguous land. As in *MacGrath,* the record did not imply that the landowner possessed superior knowledge of the danger of using the unsafe path or that the landowner encouraged the use of the dangerous crossing.

A closer analogy is presented by the California case of *Southland Corp. v. Superior Court, supra,* 203 *Cal.App.*3d 656, 250 *Cal.Rptr.* 57, in which a convenience store customer was assaulted in a vacant lot adjacent to the store's premises when he returned to his parked car after shopping. Defendant Southland Corp., the store's proprietor, knew that its customers frequently parked in the adjacent lot, which was available to Southland on a non-exclusive basis for customer parking. The injured customer mistakenly believed that the adjacent lot was under Southland's control. Southland petitioned for a writ compelling the trial court to grant its motion for summary judgment on the basis that it did not own the land where the criminal assault took place. The appellate court denied the writ, holding that triable issues of fact existed concerning the foreseeability of the criminal attack and the defendant's "actual or apparent control of the adjacent property." *Id.* at 60. Influencing the court were three factors: the defendant had benefited from its customers' use of the adjacent property for overflow parking; its store manager knew that aggressive youths loitered about the store and adjacent lot; and the defendant had taken no action to discourage patrons from parking in the vacant

lot, such as by erecting a fence or posting warning signs. Other courts have imposed a similar duty of reasonable care on landowners and occupiers who have failed to repair defective fences separating their property from unsafe conditions on adjacent property or who have failed to warn of hazards on adjacent property under circumstances involving a significant risk of foreseeable harm to unwary persons. *See, e.g., Tryon, supra,* 29 *Mass.App.Ct.* at 723, 565 *N.E.*2d at 458; *Gayden, supra,* 148 *A.D.*2d at 975, 539 *N.Y.S.*2d at 212.

The majority seeks support from out-of-state cases that hold that landowners have no duty to protect people from criminal activity on adjacent premises not under the landlord's control. *Ante* at 518–19, 688 *A.*2d at 1022. Those cases are of only tangential relevance, in that they generally involve attempts to impose liability on property owners for injury from criminal assaults that occurred on nearby property without any proof of prior recurring criminal activity or any substantial allegation that preventive measures on the defendant's own property would have precluded the criminal assault. The unique and distinguishing feature in this record is the evidence that Ivy Hill's failure to take preventive measures on its own property, in the context of its detailed knowledge of the recurring criminal activity on the adjacent lot, was a proximate cause of plaintiff's injuries.

IV

Despite the exaggerated alarm sounded by the Court's opinion, a decision upholding the verdict against Ivy Hill would impose no new duties on urban property owners to guard tenants or invitees from the general perils of city life. Rather, an affirmance simply would recognize that an owner of property has a duty to keep the premises it controls safe for the intended use of its tenants or invitees. That includes the maintenance of safe means of ingress and egress. On this record, a jury could have found that this

landowner had maintained without warning an unsafe exit from its property that posed a foreseeable risk of harm to tenants.

I would affirm the judgment of the Appellate Division.

HANDLER and O'HERN, JJ., join in this opinion.

*For reversal and remandment*—Chief Justice PORITZ, and Justices POLLOCK, GARIBALDI and COLEMAN—4.

*For affirmance*—Justices HANDLER, O'HERN and STEIN—3.